Timothy L. JOYNER, Plaintiff,

v.

**AAA COOPER TRANSPORTATION, Defendant.**

Civ. A. No. 82–884–N.

United States District Court,
M.D. Alabama, N.D.

Nov. 18, 1983.

L. Gilbert Kendrick, R.B. Moore, Montgomery, Ala., for plaintiff.

Lange, Simpson, Robinson & Somerville, Peyton Lacy, Jr. and Harry L. Hopkins, Birmingham, Ala., for defendant.

## MEMORANDUM OPINION

HOBBS, District Judge.

Plaintiff, a former employee of defendant, brought this action under 42 U.S.C. § 2000e–2 for alleged sexual harassment during his employment with defendant. Plaintiff contends that this condition caused plaintiff's layoff and subsequent termination from employment. This Court has jurisdiction by virtue of 28 U.S.C. § 1343. This matter was tried before the Court without a jury on September 14, 1983. The Court, having considered the evidence presented at trial, and the arguments of the parties as reflected in their post-trial briefs, now enters this memorandum opinion pursuant to Rule 52 of the Federal Rules of Civil Procedure, reflecting its findings of fact and conclusions of law. For the reasons stated herein, the Court finds for the plaintiff.

## FINDINGS OF FACT

AAA Cooper Transportation, defendant in this cause, is a motor carrier operating in interstate commerce. It operates terminals in various states, and during the time in question, operated a freight terminal in Montgomery, Alabama.[1] Plaintiff began

---

1. Actually, during the time in question, the freight terminal where plaintiff was employed was owned and operated by AAA Motor Lines. Prior to trial, AAA Motor Lines merged with another company to form AAA Cooper Transportation. Defendant does not contest its liability as a successor corporation.

employment with defendant in March 1980 as a shop mechanic. At that time the wage rate for mechanics was $7.45 per hour. Sometime thereafter, plaintiff requested a transfer from shop mechanic to the employment classification known as P & D driver. The job functions of a P & D driver include loading and unloading freight at the terminal as well as delivering freight to and from destinations within the city and its immediate surroundings.

Approximately six or seven months after plaintiff had first begun his employment with defendant, while he was still employed as a shop mechanic, plaintiff was approached by the terminal manager at a local drive-in restaurant. Plaintiff testified at trial that the terminal manager invited him to enter his automobile. While inside the automobile, the terminal manager allegedly placed his hands on plaintiff's private parts and asked plaintiff to engage in homosexual activities. Plaintiff emphatically refused to accede to the requests and left the automobile.[2]

Sometime after this incident, plaintiff had an encounter with Earl Dove, chairman of the board at AAA. When Mr. Dove asked plaintiff about his employment, plaintiff told him about the occurrence with the terminal manager. Mr. Dove expressed his shock and disbelief concerning this matter, and assured plaintiff that he would investigate further. Promptly upon Mr. Dove's return to company headquarters in Dothan, Alabama, he called Mr. William Buntin, general manager for the company, and relayed to him the information he had received from plaintiff's accusations, and the terminal manager denied that it had ever occurred. Mr. Buntin testified that he did not believe plaintiff's alle-

gations, but nevertheless warned the terminal manager that the allegation made by plaintiff was a serious matter in violation of company policy and that if there were any future allegations, he would be immediately suspended pending investigation by company officials. Mr. Buntin later telephoned plaintiff that the problem had been resolved, and it would not recur.

Shortly after his conversation with Mr. Buntin, the terminal manager approached plaintiff and told him that he knew plaintiff had complained to officials at the Dothan headquarters about the homosexual advance. In his direct testimony plaintiff stated that the terminal manager told him during this meeting that if he could find a reason to fire plaintiff he would. However, on cross-examination, plaintiff recanted and testified that although the terminal manager never made exactly that statement, he interpreted the statement to indicate such an intention.

On October 19, 1981, plaintiff transferred from the shop mechanic classification to the pickup and delivery driver classification when a position became vacant in the latter classification. Although this transfer resulted in a wage increase from $7.45 per hour to $9.30 per hour, plaintiff testified at trial that he strenuously objected to the transfer to Everett Norris, the assistant terminal manager, because he feared retribution from the terminal manager, who would be his direct supervisor at this new job. However, Mr. Norris testified that plaintiff never expressed to him any reluctance to assuming this new position as a P & D driver. As a result of the transfer, plaintiff, pursuant to company policy,[3] relinquished all seniority he had acquired while working as a shop mechanic and be-

---

**2.** Plaintiff's testimony concerning this event was buttressed by the testimony of Danny Wyatt and Thomas Earl Hall, both of whom related similar accounts of homosexual encounters with the terminal manager. Because the Court finds plaintiff's allegations concerning these homosexual advances toward plaintiff to be uncontested for purposes of this trial, there is no compelling reason to set out in detail the relationships Wyatt and Hall allegedly developed with the terminal manager.

**3.** The defendant's seniority rule is found at page 15 of the Employee Handbook. This rule provides, *inter alia,* the following: "[U]nit seniority exists as a basis for unit layoffs and work assignments. Economic layoffs are based on seniority only ... When an employee transfers from one unit to another or one terminal to another, [he] will be placed on the bottom of the seniority list of that unit."

came the lowest in terms of seniority of the P & D drivers.

Plaintiff continued working as a P & D driver until December 18, 1981, at which time plaintiff was laid off because of a slowdown in business. On this same date, three and possibly four[4] other P & D drivers with more seniority than plaintiff were laid off for the same reason. Testimony offered by several witnesses at trial indicated that layoffs during this time of the year were common in the trucking industry generally and at AAA. Plaintiff at no time was recalled to work, and on January 29, 1982, plaintiff lost his "regular status"[5] as an employee and was terminated.

After his layoff on December 18, 1981, plaintiff made several inquiries about reemployment. First, plaintiff asked Mr. Norris whether he could reacquire his former position as a mechanic in the shop department. He was correctly told by Mr. Norris that under company policy this would be impossible because another man had been hired as a mechanic and plaintiff had lost his seniority as a mechanic and hence could not "bump" the new employee and reacquire his old job. Next, plaintiff testified that he called the terminal manager several times to find out when he could return to work, and, during their last conversation, the terminal manager emphatically told plaintiff that there was no work available for him. Plaintiff told the terminal manager that he had talked with other drivers of AAA, and they had advised him

that business had increased at AAA sufficiently so that work was available for plaintiff. The terminal manager told plaintiff that he could not come back to work and that he did not owe him "a damn thing." Finally, plaintiff contacted Mr. Buntin about the possibility of employment with the company as a line haul driver; however, Mr. Buntin told plaintiff that his personnel file indicated that he was not qualified to work as a line haul driver. Despite these and other efforts by plaintiff to return to work, the terminal manager refused to recall plaintiff, citing a depressed demand for trucking services as the basis for this refusal. Yet, shortly after plaintiff lost his regular status on January 29, 1982, Gaylan Grant and Ernest Battle were recalled to work. In fact, the personnel records of the company indicate that plaintiff was the only full-time P & D driver at the Montgomery terminal who was not recalled from layoff.[6] More significantly, a new employee, Donald Webb, was hired as a P & D driver on March 15, 1982.

Discouraged about his future with defendant, plaintiff sought work elsewhere. On April 28, 1982, plaintiff, while employed at Flavorich, Inc., filed a charge of sex discrimination against AAA with the EEOC. After an administrative investigation, the EEOC issued its determination finding no probable cause to believe plaintiff's allegations were true. After receiving his right to sue letter from the EEOC,

---

**4.** The testimony at trial concerning the number and identity of employees laid off at this time was disputed. Witnesses for the defendant testified that three P & D drivers, other than plaintiff, were laid off on December 18, 1981, namely, Gaylan Grant, Ernest Battle, and Ruben Rogers. Plaintiff testified that in addition to these three employees, Thomas Hurley was also laid off from work as a P & D driver.

**5.** The following company rule appears at page 14 of the Employee's Handbook:

A regular employee is one who has received productive pay for 35 or more hours in each week for eight consecutive weeks ... Loss of regular status occurs when an employee receives productive pay for less than 35 hours in each week for eight consecutive weeks due to economic layoff, sickness, or injury.

The testimony at trial was undisputed that for the week ending December 11, 1981, plaintiff worked 33.1 hours and for the week ending December 18, 1981, plaintiff worked only 28.5 hours. On December 18, 1981, plaintiff, the junior employee working on the dock, was laid off from work because of a slowdown in business. For the next six weeks, plaintiff did not work. Consequently, on January 29, 1982, plaintiff lost his "regular status" and was terminated.

**6.** Moreover, the personnel records indicate that Ruben Rogers, a part-time P & D driver laid off at the same time as plaintiff, was recalled on March 1, 1982, even though he had never obtained regular status and thus had no seniority.

plaintiff timely filed suit in this Court on December 20, 1982.

## CONCLUSIONS OF LAW

■ Title VII of the Civil Rights Act prohibits discrimination on the basis of sex.[7] Although the language of Title VII does not specifically address the issue of whether sexual harassment constitutes discrimination on the basis of sex, it is now well established that Title VII does proscribe such conduct. *See, e.g., Henson v. City of Dundee,* 682 F.2d 897 (11th Cir. 1982); *Bundy v. Jackson,* 641 F.2d 934 (D.C.Cir.1981); *Tomkins v. Public Service Electric & Gas Co.,* 568 F.2d 1044 (D.C.Cir. 1977). *See generally,* Note, *Sexual Harassment and Title VII: The Foundation for Elimination of Sexual Cooperation as an Employment Condition,* 76 Mich.L.Rev. 1007 (1978). Perhaps prompted by the judicial adoption of sexual harassment as a theory of recovery for sex discrimination, the EEOC Guidelines, 29 C.F.R. § 1604.11 (1982), take the position that sexual harassment is a violation of Section 703 of Title VII. While the decisions holding that unwelcomed sexual harassment violates Section 703 have dealt with harassment in the *heterosexual* context,[8] this Court determines that unwelcomed *homosexual* harassment also states a violation of Title VII.

As in all Title VII disparate treatment cases, the Court must apply a three-part analysis to the evidence presented. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). In *Burdine,* the Supreme Court summarized this three-part analysis of the burdens and order of proof as follows:

First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, non-discriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Id.* 450 U.S. at 252–53, 101 S.Ct. at 1093. Additionally, *Burdine* teaches that the burden of persuasion remains at all times with the plaintiff. With this in mind, the Court proceeds to analyze the prima facie case in Title VII sexual harassment claims.

## I. THE PRIMA FACIE CASE.

In *Henson v. City of Dundee,* 682 F.2d 897 (11th Cir.1982), the court established the essential elements of the prima facie case of sex discrimination based upon unwelcomed sexual harassment. In determining that unwelcomed sexual harassment in the workplace violates Title VII, the court established two branches of this cause of action. First, sexual harassment which creates a "hostile or offensive work environment" is actionable under Title VII. Under this branch, an employee need not prove the loss of a tangible job benefit in order to recover.

A pattern of sexual harassment inflicted upon an employee because of [his or] her sex is a pattern of behavior that inflicts disparate treatment upon a member of one sex with respect to terms, conditions, or privileges of employment. There is no requirement that an employee subjected to such disparate treatment prove in addition that [he or] she has suffered tangible job detriment.

*Id.* at 902. The second branch of sexual harassment which gives rise to a cause of

---

**7.** Section 703 of Title VII, 42 U.S.C. § 2000e–2 provides:

(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin.

**8.** *But see Wright v. Methodist Youth Services, Inc.,* 511 F.Supp. 307 (N.D.Ill.1981).

action under Title VII for sex discrimination is commonly known as *quid pro quo* sexual harassment. Under this branch, an employee must demonstrate a loss of tangible job benefits due to his or her refusal to succumb to a supervisor's demand for sexual consideration in exchange for those job benefits. Because there was evidence of only one incident of unwelcome and unsolicited sexual harassment involving plaintiff, the Court considers the evidence solely on the issue of *quid pro quo* sexual harassment. The Court does not agree with plaintiff's contention that as to him there existed an abusive working environment created by severe and persistent sexual harassment.

In order to establish a violation of Title VII on the grounds of *quid pro quo* sexual harassment, the Court must consider whether the evidence satisfied the five requisite elements of *quid pro quo* harassment. *See Henson v. City of Dundee*, 682 F.2d at 909.

Unquestionably, plaintiff satisfied the first three elements; *viz.*, he was a male, he was subjected to unwelcome sexual harassment, and since the evidence established the terminal manager's homosexual proclivities, the harassment to which plaintiff complained was based upon sex. The Court also finds that plaintiff satisfied the fourth element in that the evidence was sufficient to show that plaintiff's rejection of the homosexual overtures ultimately caused a tangible job detriment. Finally, employer liability by virtue of respondeat superior naturally follows from a finding that the other four elements are present.

The *Henson* court further refined the prima face case for *quid pro quo* sexual harassment by adjusting the five elements and formulating a test which more closely tracks the language of *McDonnell Douglas v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973). *See Henson v. City of Dundee*, 682 F.2d at 911, n. 22. However, plaintiff's injury in *Henson*—the denial of an opportunity to attend the police academy—is different from plaintiff's injury here—failure to be recalled from economic layoff when a position became available. Consequently, the test elicited in *Henson* needs slight modification here. To establish a prima facie case of illegal refusal to recall plaintiff from layoff in retaliation against plaintiff's refusal of sexual advances, plaintiff must show (1) he is a member of the protected class; (2) he was subjected to unwelcome sexual harassment to which members of the opposite sex had not been subjected; (3) after layoff, he requested to return to work for which he was qualified; (4) that despite his qualifications he was rejected; (5) after his layoff a position became available and the employer filled the position with another employee who possessed plaintiff's qualifications, despite plaintiff's expressed desire to return to his former position. After considering the evidence presented at trial, the Court concludes that plaintiff has met his *McDonnel Douglas* burden of proving a prima facie case. First, plaintiff is a member of the protected class (males). Second, the evidence is clear that plaintiff did not solicit or incite the homosexual overtures of the terminal manager; rather, plaintiff repulsed the terminal manager and stated that he would resign before submitting to the homosexual advances. Third, the evidence is uncontroverted that plaintiff made several requests to return to work after his layoff on December 18, 1981. Fourth, it is equally clear that plaintiff has never been recalled to work. Fifth, the evidence disclosed that despite plaintiff's continued requests to return to work, part-time employee Ruben Rogers was recalled on March 1, 1982, and a new employee, Donald Webb, was hired on March 15, 1982 to fill plaintiff's former position. There was no evidence presented that Rogers or Webb was more qualified than plaintiff or that plaintiff's prior work performance as a P & D driver was inadequate.

## II. DEFENDANT'S BURDEN OF PRODUCTION

Having determined that plaintiff has established a prima facie violation of Title VII, the burden of production now

shifts to defendant to articulate a legitimate, nondiscriminatory reason for its refusal to recall plaintiff from layoff. This burden requires defendant to articulate a reason that "raises a genuine issue of fact as to whether it discriminated against plaintiff." *Lincoln v. Board of Regents of The University System of Georgia*, 697 F.2d 928, 937 (11th Cir.1983), *quoting, Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981).

Defendant introduced evidence that the company suffered a decline in business in mid-December of 1981. Due to this business decline, officials at the Montgomery terminal felt that a reduction in force was necessary. Pursuant to company policy as reflected in the rules concerning seniority, four employees—Gaylan Grant, Ernest · Battle, Ruben Rogers, and plaintiff—were laid off from work because they were the lowest employees in terms of accumulated seniority in the P & D driver classification.[9] Business remained depressed for a period exceeding six weeks and these four employees remained unemployed.

Defendant also introduced evidence that the company had adopted a rule which provided that an employee who worked less than thirty-five productive hours for eight consecutive weeks lost his "regular status" as an employee and was then subject to termination. The evidence clearly established that for two weeks prior to his layoff, plaintiff had failed to work thirty-five productive hours. These two weeks, coupled with six weeks of unemployment with the company due to economic layoff, resulted in eight consecutive weeks in which plaintiff failed to work for more than the required thirty-five hours. Consequently, and in accordance with this company policy, plaintiff lost his regular status as an employee with the company and was terminated.

Having heard the evidence introduced by defendant, and mindful that defendant carries only the burden of production and not the burden of persuasion at this stage, the Court concludes that defendant has succeeded at step two, i.e., it has rebutted the presumption of discrimination that arose when plaintiff established its prima facie case by articulating a legitimate, nondiscriminatory reason for its actions. Therefore, the burden of production is merged with the burden of persuasion and both now rest with the plaintiff to prove that defendant's articulated reasons were pretextual.

### III. PLAINTIFF'S BURDEN OF PROVING PRETEXT

■ The burden now rests with plaintiff to prove by a preponderance of the evidence that the reasons proffered by defendant for not recalling him from layoff were pretextual and not the true reasons for the employment decision. *See, e.g., Lincoln v. Board of Regents of the University System of Georgia*, 697 F.2d 928, 938 (11th Cir.1983); *Pittman v. Hattiesburg Municipal Separate School District*, 644 F.2d 1071, 1076 (5th Cir.1982). Title VII is violated if plaintiff can prove at this stage that an impermissible factor played a significant role in defendant's employment decision. *Whiting v. Jackson State University*, 616 F.2d 116, 121 (5th Cir.1980). After considering the evidence introduced at trial, the Court concludes that plaintiff has carried this burden and defendant's decision not to reinstate plaintiff to his former position when it became available violated Section 703 of Title VII.

The Court does not attach any improper discriminatory intent on the part of defendant to reduce its work force on December 18, 1981, by laying off plaintiff and the other employees. A significant decline in business, coupled with the documented company policy that employees with the least unit seniority are the first to be laid off in an economic decline fully warranted this employment decision. Nor does the Court attach any discriminatory intent to the fact that Grant and Battle were re-

---

**9.** The evidence indicated that Ruben Rogers was a part-time employee who had never enjoyed "regular status" and therefore had never accumulated any seniority.

called from layoff before plaintiff in that the personnel records indicate that both were senior to plaintiff. However, the Court does find a violation of Section 703 when defendant recalled Ruben Rogers on March 1, 1982, when a position became available, despite the fact that plaintiff had continually expressed his desire to be reinstated once an opening occurred.

Mr. Norris testified at trial that while the dispatcher was primarily responsible for deciding when an additional P & D driver was needed to meet expanding demands for business, the final decision to recall someone from layoff or to hire a new employee to meet the company's needs rested with the terminal manager. The testimony revealed that plaintiff expressed to the terminal manager his desire to return to work on several occasions, and on each occasion, plaintiff was told no work was available. In his last conversation with plaintiff, the terminal manager told plaintiff that he could not return to work and that he did not owe plaintiff "a damn thing." The Court finds that this refusal to recall plaintiff when a position became available on March 1, 1982, was contaminated by plaintiff's earlier refusal to succumb to the terminal manager's homosexual advances and by the terminal manager's anger at plaintiff's report of that incident to the president of the company. The terminal manager's homosexual overtures to plaintiff and his angry reaction to plaintiff's reporting the encounter were significant factors in the decision of the terminal manager not to recall plaintiff from layoff. In the view of this Court, plaintiff's bid to return to work would not have been rejected *but for* plaintiff's refusal to cooperate with the terminal manager's homosexual demands and his action of reporting the incident to Mr. Dove. In other words, in the Court's opinion there is a clear nexus between the rejection of the sexual harassment and the tangible job detriment.

Defendant did not introduce any evidence at trial that plaintiff's work performance as a P & D driver was unsatisfactory nor does it assert this in its post-trial brief. Rather, defendant justified its refusal to recall plaintiff solely on the basis that plaintiff had lost his "regular status" and was terminated. However, the personnel records introduced at trial clearly show that Ruben Rogers, a part-time employee who had never even obtained "regular status" was recalled to work on March 1, 1982. Consequently, the Court finds that the reason articulated by defendant for failing to recall plaintiff, i.e., that he had lost his regular status, is mere pretext.

The Court cannot understand why AAA would fail to recall an experienced employee whose work had always been satisfactory and who had made it abundantly clear that he desired re-employment. While plaintiff's loss of regular status afforded AAA an apparent nondiscriminatory excuse not to recall plaintiff, the evidence introduced at trial clearly demonstrates that this excuse is pretextual.

## IV. RELIEF

Having found that a violation of Title VII occurred when defendant failed to recall plaintiff from layoff on March 1, 1982, and, instead recalled Ruben Rogers as the new P & D driver, the Court concludes that plaintiff is entitled to reinstatement to his former position with defendant as well as back wages lost by virtue of defendant's discriminatory act. In light of the conflicting evidence concerning the average number of hours plaintiff worked as a P & D driver, the Court determines that forty hours per week is appropriate. Therefore, plaintiff's weekly salary was approximately $372.00. Since plaintiff missed eighty-nine weeks of employment with defendant (measured from March 1, 1982 to November 4, 1983), he lost $33,108.00 in wages. Recognizing that plaintiff has a duty to mitigate his damages under Title VII, *Bourque v. Powell Electrical Manufacturing Co.*, 617 F.2d 61, 65–66 (5th Cir.1980), the Court will deduct from plaintiff's recovery of back wages the amount of $28,161.61, which represents plaintiff's interim earnings since the date of his termination. Therefore, plaintiff

shall recover the sum of $4,947.39 from defendant as back wages.

A separate judgment will be entered in accordance with this memorandum opinion.