George E. HOPKINS, Jr., Plaintiff,

v.

BALTIMORE GAS & ELECTRIC
COMPANY, Defendant.

Civ. No. H–93–4167.

United States District Court,
D. Maryland.

Dec. 28, 1994.

Louis B. Price, Glenn E. Bushel, and Brocato, Price & Bushel, Baltimore, MD, for plaintiff.

L. Ellis Justis, J. Michael McGuire, Robert H. Ingle, III and Shawe & Rosenthal, Baltimore, MD, for defendant.

ALEXANDER HARVEY, Senior District Judge.

In this civil action, plaintiff George E. Hopkins, a white male, has sued his former employer, Baltimore Gas and Electric Company ("BG & E" or the "Company"), asserting claims of sex discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). Plaintiff alleges that he was sexually harassed by his male supervisor at BG & E and that he was disciplined by that supervisor and by others after he complained to BG & E officials about the supervisor's conduct. Plaintiff further alleges that he was terminated by BG & E in October of 1993 in retaliation for his having filed charges of discrimination and retaliation with the Equal Employment Opportunity Commission (the "EEOC").

Presently before the Court is a motion for summary judgment filed by defendant BG & E. Following its review of the memoranda, exhibits, affidavits, deposition excerpts and other discovery materials which the parties have submitted, the Court has determined that no hearing is necessary for a decision on the pending motion. *See* Local Rule 105.6. For the reasons to be stated, defendant's motion for summary judgment will be granted, and judgment will be entered in favor of BG & E.

## I

### Background Facts

Discovery has been completed in this action, and the parties have submitted extensive materials both in support of and in opposition to the pending motion for summary judgment. Viewing the record and all reasonable inferences drawn therefrom in the light most favorable to plaintiff, the facts of this case are as follows.[1]

---

1. There are many disputed questions of fact as to the occurrence, timing and nature of many of the alleged acts of harassment of Ira Swadow.

However, for reasons stated herein, these disputed issues of fact are not material to the essential issues in the case and do not preclude the entry

Plaintiff was employed by defendant BG & E as a Color Photographic Technician from September 3, 1985 until October 19, 1993. During this entire time, plaintiff worked in BG & E's Photographic Services Unit (the "Unit"), and his immediate supervisor was Ira Swadow. Plaintiff alleges that throughout his term of employment with BG & E he was subjected to various forms of harassment by Swadow, including jokes, comments, and gestures of a sexual nature. During the course of discovery in this case, plaintiff has identified over a dozen incidents of alleged "sexual harassment" by Swadow. Plaintiff contends that, when viewed in their entirety, these various incidents demonstrate that Swadow intentionally subjected plaintiff to a sexually abusive and hostile work environment in violation of Title VII. Since the case is now before the Court pursuant to defendant's motion for summary judgment, it is necessary to describe in some detail each of the alleged incidents upon which plaintiff has based his claims for relief under Title VII.

According to plaintiff, the earliest incident of harassment took place some time in 1986, when Swadow entered the men's room at work while plaintiff was using the facilities, pretended to lock the door, and said, "Ah, alone at last." Although plaintiff testified in his deposition taken in this case that Swadow's remark made him feel "very uncomfortable," plaintiff apparently ignored the remark at the time and left the bathroom without further comment or incident. Plaintiff also testified in his deposition that on other occasions when the two of them happened to be in the men's room at the same time, Swadow would look at plaintiff in the mirror in a way which caused plaintiff to feel "uncomfortable." [2]

According to plaintiff, he was on several occasions harassed by Swadow because of plaintiff's relationship with and eventual marriage to another BG & E employee, Jo–Ann Stansbury. On one occasion in 1987, plaintiff received a work-related document from Stansbury through the Company's internal mail system. Across the top of the document, someone other than Stansbury had written the words "S.W.A.K.[3], kiss kiss" and had drawn "little hearts." In his deposition, plaintiff testified that although he never asked Swadow if he had written these comments, plaintiff "knew" that Swadow had done so because he "recognized Swadow's handwriting."

On another occasion in February of 1988, during an office party given by plaintiff at his home and attended by Swadow, a comment was made by Swadow in the presence of plaintiff's future mother-in-law suggesting that an unplanned pregnancy had been the real reason for plaintiff's recent proposal of marriage to her daughter. Although plaintiff was not present at the time, he later learned of the comment from his future mother-in-law. Notwithstanding this continual "harassment," plaintiff apparently remained friendly with Swadow and invited Swadow to his wedding in June of 1988. According to plaintiff, Swadow managed to "sexually harass" him even on that occasion. At the reception following the wedding, Swadow approached

of summary judgment. Even accepting as true plaintiff's version of the various events which are the subject of this litigation, this Court has concluded that plaintiff has failed to make out a *prima facie* case either of sex discrimination or of retaliation under Title VII. "Accordingly, the facts summarized below, where disputed, reflect plaintiff's version of the events to the extent it is supported by affidavits, depositions or other documentary evidence." *Magnuson v. Peak Tech. Services*, 808 F.Supp. 500, 504 (E.D.Va.1992).

2. The apparent source of plaintiff's discomfort on these and other occasions was his suspicion and belief that Swadow was bisexual. Although Swadow was married with children during the events which are the subject of this litigation, plaintiff testified in his deposition that he believes that Swadow is bisexual, rather than homosexual, because "he appears to like both men and women." There is evidence in the record indicating that Swadow had previously been accused of sexually harassing female employees at BG & E. In his answer to an interrogatory propounded by defendant BG & E, plaintiff stated under oath that Peggy Mulloy, a BG & E employee, once told him that she had previously been sexually harassed by Swadow. Defendant BG & E has confirmed that Mulloy did in fact once lodge an internal complaint with the Company in which she alleged that she had been sexually harassed by Swadow.

3. In his deposition, plaintiff testified that he understood the acronym "S.W.A.K." to stand for the phrase "Sealed With A Kiss."

plaintiff while he stood in the receiving line, embraced him, and kissed him on the cheek. Plaintiff testified in his deposition that he has a photograph of the incident and that he considered it to have been "sexual harassment" because Swadow was the only male who kissed him that day.

Other incidents of alleged harassment occurred prior to April of 1990.[4] On one occasion, Swadow approached plaintiff while he was leaning against a table at work, pivoted an illuminated magnifying lens so that it was positioned above plaintiff's crotch, and said, "Where is it?" Plaintiff testified in his deposition that he responded by pushing the lens away and by telling Swadow to leave him alone. On another occasion, Swadow and plaintiff bumped into one another, and Swadow said to plaintiff, "You only do that so you can touch me." Plaintiff testified in his deposition that he did not know whether Swadow's hands or just his body had come into contact with him on that occasion, but that Swadow had definitely not touched him in the genital area nor "in any other sexual area." On another occasion, Swadow asked plaintiff, "On a scale of 1 to 10, how much do you like me?" Plaintiff testified in his deposition that he found this remark to be "inappropriate" because "[i]t was like some high school kid asking a prospective boyfriend [or] girlfriend how much do you like me on a scale of 1 to 10. It was offensive and juvenile and certainly inappropriate from a supervisor."

On another occasion, Swadow removed a piece of mail from plaintiff's Company mail box, wrote the word "Alternate" in front of the word "Lifestyles," which happened to be printed on the return address of the envelope, and then placed the altered envelope back in plaintiff's mail box. Plaintiff testified in his deposition that he understood the term "alternate lifestyles" to refer to Swadow's sexual orientation. On another occasion, in the course of a discussion which Swadow was having with plaintiff and a male vendor concerning the difficulties of surviving an airline crash in water, Swadow said that if he were

in such a situation he would "find a dead man, cut off his penis and breathe through that." In his deposition, plaintiff testified that he told Swadow that he was "sick" and that his remark was "inappropriate," particularly in the presence of some one not employed by the Company.

On several other occasions, Swadow made inquiries and comments which plaintiff felt were embarrassing and "overly personal." For example, once while plaintiff was demonstrating the operation of the color darkroom to a female visitor, Swadow called out to plaintiff as Swadow was coming through the revolving entrance to the darkroom, "Are you decent?" On other occasions before plaintiff's engagement, Swadow asked plaintiff whether he had gone on any dates over the weekend and, if so, whether any of those dates had culminated in sexual intercourse.

Although several of the incidents described hereinabove occurred as early as 1986, plaintiff did not complain to Company officials concerning Swadow's alleged harassment until the Fall of 1989. In September of 1989, plaintiff met with Fran Johannson, Swadow's immediate superior at the time, and related to her many of the incidents described hereinabove. About the same time, plaintiff also spoke with Bill Dunson, BG & E's Employee Grievance Coordinator. Pursuant to the Company's internal grievance procedures, Dunson filled out a grievance form dated September 19, 1989, in which he summarized plaintiff's allegations as follows:

> Says Swadow is unsupportive of his medical restrictions & wants 15% OT [overtime]. Also makes inappropriate & sexual comments and behavior—focuses magnifier on crotch and says "where is it (penis)?" Bumps him & says "You like to touch me." Makes sexual/ethnic jokes in group sessions.

After interviewing Swadow and several other employees who worked in the Unit, both Johannson and Dunson concluded that there was "no substance" to plaintiff's allegations of sexual harassment. Johannson then met with plaintiff and informed him that she

---

4. Although plaintiff has not been able to identify the specific dates on which each of the incidents described hereinafter occurred, these incidents were discussed by plaintiff with various Company officials during or before April of 1990.

had been unable to find any support for his allegations, but that she had spoken with Swadow about the matter and that the situation should return to normal. According to plaintiff, the sexual harassment did in fact "diminish considerably" for about a period of time.

In early April of 1990, plaintiff again contacted Johannson and told her that the harassment had resumed and that Swadow also had begun to retaliate against him by "looking at [plaintiff's] work a little more closely than he had used to and [by] pushing [plaintiff] to do overtime, things like that." Plaintiff also told Johannson that he wanted to take his complaints to the "next level" of Company administration. Johannson then arranged for plaintiff to meet with George Gephart, Manager of Corporate Communications. A meeting was scheduled for April 10, 1990.

Just prior to his scheduled meeting with Gephart, plaintiff received his annual performance appraisal for the preceding twelve months (the "1990 appraisal"). The appraisal was dated March, 1990 and had been prepared by Swadow and signed by Johannson. The 1990 appraisal indicated that plaintiff's overall job performance was rated as a "B," meaning that plaintiff had "met expectations." However, plaintiff's performance in three of the six individual categories (quality of work, dependability, and job behavior) was rated at the level of "needs improvement," and plaintiff's performance in one other individual category (work relations) was rated at the level of "unsatisfactory." The 1990 appraisal also contained comments to the effect that plaintiff "[a]bsolutely must immediately work on improving relationships with colleagues in the Unit" and that plaintiff's "patronizing and arrogant attitude towards and criticism of Senior Photographers is inappropriate." In addition, the 1990 appraisal criticized plaintiff for refusing to work overtime and for making excessive requests for both personal leave and sick leave.[5]

On April 10, 1990, plaintiff met with Gephart and presented him with a seven-page document entitled "Unit Situation Report" which plaintiff had prepared in anticipation of their meeting. In that Report, plaintiff set forth wide-ranging allegations of incompetence and malfeasance on the part of Swadow and others in the Photographic Unit.[6] Although he briefly reiterated several of the alleged incidents of sexual harassment about which he had previously complained to Johannson and Dunson in September of 1989, plaintiff focused essentially in his Report on numerous extraneous matters completely unrelated to his claims of sexual harassment. Indeed, plaintiff acknowledged in his conclusion to the Report that "[t]his past September I discussed all of the things talked about here with Fran Johannson" and that since that time "[t]he sexual harassment seems to have stopped, permanently I hope." [7]

Gephart told plaintiff that he would refer plaintiff's allegations of sexual harassment to Anton Endler, BG & E's Manager of Employee Services, for further investigation. Gephart and plaintiff then discussed the 1990

---

**5.** Plaintiff's salary increases and other benefits were not adversely affected in any way by the 1990 appraisal. Indeed, because plaintiff was rated (by Swadow) at an overall job performance level of "B" on every performance appraisal he received during the course of his employment at BG & E, plaintiff's salary increases and other benefits were not at any time adversely affected by such appraisals.

**6.** In his Report, plaintiff alleged, *inter alia,* that Swadow repeatedly violated or ignored Company safety guidelines; that he was unresponsive to the health and safety concerns of those working under his supervision; that he had on several occasions violated the Company's policies relating to conflicts-of-interest by accepting gifts and other valuable consideration from parties doing business with the Company; that he had a "his-

tory" of telling ethnic and racial jokes; and that he often attended to purely personal matters while purportedly working "overtime."

Swadow was not the only one whose competence and professionalism were attacked by plaintiff in the Report. For example, plaintiff also stated his opinion that the Senior Photographers in the Unit lacked "the technical skills or expertise to perform their duties" and that "the coverup of their deficiencies by supervision is detrimental to unit morale and costly to the Company."

**7.** This statement made by plaintiff contemporaneously in April of 1990 in his Report contradicts his present assertion that the alleged sexual harassment by Swadow continued during the period from September of 1989 to April of 1990.

appraisal which plaintiff had just received. Plaintiff told Gephart that there were a number of inconsistencies, contradictions and outright falsehoods contained in the appraisal. Although Gephart refused to overrule Swadow and Johannson in their overall job performance rating of "B," certain other changes to plaintiff's 1990 appraisal were eventually made at Gephart's direction.[8]

Following his April 10, 1990 meeting with plaintiff, Gephart referred plaintiff's Report to Endler, who directed Faye Pines, a case analyst in the Company's Employee Services Department, to investigate the various allegations made therein by plaintiff. Pines interviewed plaintiff and Swadow, as well as some eight other BG & E employees who worked in the Photographic Unit. Pines' summary of her April 16, 1990 interview with plaintiff indicates that plaintiff told her that the sexual harassment by Swadow had ended in September of 1989,[9] that Swadow had never physically touched him, and that he could not recall Swadow ever making any explicit sexual remark. Pines set forth the results of her investigation in a report dated April 25, 1990 which she submitted to Endler. In her report, Pines stated that "Swadow probably has been easy going with employees and probably has been playful with individuals he supervises. But, I cannot conclude that the behavior was sexually motivated." Pines further stated that her "impression is that [plaintiff] is indeed trying to 'hang' Swadow (to use the words of [plaintiff's] only friend, Charlie Ashton)."[10] Pines' ultimate recommendation was that no "corrective action" was needed because the Unit's work environment did not appear to be "tainted by race or sex activities."

Some time thereafter, plaintiff had a follow-up meeting with Endler. At that meeting, Endler allegedly told plaintiff that if he continued to pursue this matter he could end up losing his job and that he should just "forget it" and get on with his life.

Plaintiff later met again with Dunson. Pursuant to Company policy, Dunson had filled out another grievance form which related to the complaints which plaintiff made to Johannson in early April of 1990. In that grievance form, which is dated April 5, 1990, Dunson summarized plaintiff's complaints as follows:

> Says his supervisor intimidates, stresses out, and continues to make sexual innuendo-type comments.
>
> ... On April 10, [plaintiff] presented a 7 page document identifying concerns. Issues were favoritism, joking, Swadow's relationship with subordinates, and workplace atmosphere. Additionally, he vehemently disagreed with negative comments on his 3/90 appraisal.

At their meeting, Dunson advised plaintiff that because the sexual harassment issues had already been investigated by him in connection with the grievance initiated by plaintiff on September 19, 1989 and had been found to be without substance, and because plaintiff was not alleging that any further incidents of sexual harassment had occurred since then, no further action would be taken by the Company in that regard. Dunston told plaintiff that he should put those earlier incidents behind him, that certain changes had been made to plaintiff's 1990 appraisal and that Swadow would continue to be "under close scrutiny." It was Dunson's impression that plaintiff was satisfied with these results.

Over a year later, in May of 1991, Swadow asked plaintiff to reprint a particular photograph which plaintiff had previously prepared. Swadow believed that the print was very much out of focus. Plaintiff told Swadow that the problem was with the photographic negative and that a reprint would be a waste of time. Swadow told plaintiff to do it anyway. Plaintiff then produced several

---

**8.** Specifically, two of the "needs improvement" ratings were raised to the level of "meets expectations," certain comments relating to plaintiff's requests for leave were deleted from the appraisal, and Swadow was directed to make an interim appraisal of plaintiff's progress in July of 1990. In that interim appraisal, plaintiff was rated at the "meets expectations" level in all six individual categories and again received an overall rating of "B."

**9.** See note 7, *supra.*

**10.** Ashton was a co-worker in the Unit.

reprints of the photograph using various techniques and equipment. Plaintiff also asked a co-worker to prepare a reprint using her own equipment. Plaintiff then returned to Swadow three prints which purportedly were the original print along with the two requested reprints. Because all three prints appeared to be the same and because they appeared to be more focused than was the original print, Swadow questioned whether plaintiff had in fact returned the original out-of-focus print which Swadow had seen earlier. Plaintiff said that he had. After conferring with three other employees in the Unit who had seen the original out-of-focus print and who had all concurred in Swadow's opinion that the purported "original" returned by plaintiff was not the same out-of-focus print which they had seen earlier, Swadow accused plaintiff of having switched one of his reprints for the "real" original in an attempt to "trick" Swadow and avoid being "put on the spot" for his poor work in producing the "real" original.

On June 10, 1991, plaintiff was issued a "Formal Warning" by Swadow, with Johannson's concurrence, on the asserted ground that plaintiff had not been "truthful" with Swadow in connection with the incident described hereinabove. In response to this Formal Warning, plaintiff met with Joseph Tiernan, Vice President of Corporate Affairs. In his notes summarizing their meeting, Tiernan observed that "it does appear that there's a fair amount of contention among [plaintiff], the photographers, and Ira Swadow, primarily dealing with the issues of the quality of photographs and personality conflicts." Tiernan also noted that "some kind of psychological testing or counseling for [plaintiff] and perhaps Swadow might be useful." No mention was made in Tiernan's notes of any complaints made by plaintiff at the time of being sexually harassed by Swadow. At the conclusion of their meeting, Tiernan told plaintiff that the matter would be thoroughly investigated.

An investigation was then conducted by Jim O'Connell, a case analyst in the Company's Employee Services Department. O'Connell interviewed plaintiff, Swadow and the three other employees in the Unit who had seen both the "real" original print and the purported "original" print returned by plaintiff. O'Connell concluded that each of the three other employees corroborated Swadow's version of the incident, namely, that plaintiff had switched the prints and had not been truthful.

On June 21, 1991, both plaintiff and Swadow were referred to the Company's in-house medical staff for psychological evaluations. Plaintiff and Swadow were then separately interviewed by Dr. Bruce Martenis, a psychologist. Martenis concluded that both plaintiff and Swadow were fit to return to work.

After having received the reports and recommendations of both O'Connell and Dr. Martenis, Endler met with plaintiff and Swadow and told them that the Formal Warning would stand and that they should both return to work and put the incident behind them. According to plaintiff, Endler told plaintiff and Swadow that they "should stop acting like little boys." Plaintiff later met with Tiernan, who confirmed that the Company considered the matter to be closed.[11]

According to plaintiff, the harassment and retaliation only increased following the Company's decision not to pursue matters further. Swadow allegedly threatened plaintiff by telling him that he was mistaken if he thought that it was over between them. Swadow also allegedly told plaintiff that he wanted to inspect plaintiff's work at the end of each day before plaintiff went home and that plaintiff would no longer be permitted to do personal work in the darkroom. According to plaintiff, on August 1, 1991, Swadow sexually harassed plaintiff yet again. On that date, plaintiff was working by himself in

---

**11.** In November of 1992, the Formal Warning was removed from plaintiff's personnel file at the direction of Edwards, who had recently replaced Gephart as Manager of the Department in which plaintiff worked. In an affidavit submitted in support of defendant's motion for summary, Edwards states that he did this because he "wanted to afford [plaintiff] a 'clean slate' and.... assist [plaintiff] in returning his focus to his job duties and his future employment." Edwards further states in his affidavit that his action was *not* because he had "reached any conclusion about the basis for the [Formal Warning]."

the darkroom when he heard the revolving entrance to the darkroom begin to rotate, indicating that some one was coming into the darkroom from the outside. Ordinarily, only one person at a time can fit through the revolving entrance to the darkroom, which is very small because of the need to prevent light from the outside from contaminating the exposed film in the darkroom. On this occasion, however, Swadow and another male employee had both squeezed into the revolving compartment at the same time, and upon exiting from that small space, Swadow looked at plaintiff and said, "Was it as good for you as it was for me?" Some time thereafter, Swadow allegedly attempted in a similar fashion to squeeze into the small, revolving compartment at the same time as plaintiff, but plaintiff objected and refused to allow Swadow to do so. Plaintiff now contends that Swadow's conduct on both of these occasions constituted sexual harassment.

On or about December 20, 1991, plaintiff filed a charge of discrimination and retaliation with the EEOC (the "Charge"), alleging that, "on a continuing basis" since he began his employment with BG & E in September of 1985, plaintiff had been subjected to "sexual harassment, repeated jokes, comments and gestures of a sexual nature" by his supervisor, Swadow. Plaintiff alleged that this harassment had created a hostile work environment and had continued despite the fact that plaintiff had brought his claim of harassment to the attention of numerous Company officials in 1990. Plaintiff further alleged that he had been "retaliated against by being disciplined on June 24, 1991." [12]

The EEOC never completed its investigation of plaintiff's charges. Rather, at plaintiff's request, on September 30, 1993, the EEOC terminated its investigation and issued to plaintiff a "right-to-sue" notice. According to plaintiff, the harassment and retaliation continued even after he filed his Charge with the EEOC. Plaintiff alleges that on several occasions Swadow required him to perform strenuous physical activities and to work overtime despite medical restrictions related to surgery which plaintiff had undergone in late 1991. Plaintiff also complains of certain "negative comments" contained in his annual performance appraisal dated September, 1992. However, in his deposition, plaintiff admitted that his salary and other benefits had not been reduced or otherwise adversely affected in any way as a result of these comments. Plaintiff also complains of Edwards' "retraction" of his prior approval of plaintiff's request to attend an advanced computer seminar. In his affidavit, Edwards states that his approval of plaintiff's request was subject to review by the Employee Services Department, which had concluded that plaintiff did not have the educational prerequisites to attend a seminar at such an advanced level. Plaintiff has not disputed Edwards' statement in this regard.

Concerning his allegations of continued sexual harassment by Swadow during the pendency of the EEOC's investigation of plaintiff's Charge, plaintiff has identified only two incidents. On the first such occasion, which allegedly occurred in May of 1993, Swadow approached plaintiff, who happened to be wearing a certain necktie that day at work, and said, "You look so distinguished." Swadow then lifted plaintiff's necktie and turned it over to look at its label. Although plaintiff apparently did not at the time object to Swadow's conduct, plaintiff now contends that he considered Swadow's comments and

12. The record here does not indicate that any actionable retaliation occurred on June 24, 1991. The Formal Warning was issued to plaintiff on June 10, 1991. The psychological evaluation which plaintiff was required to undergo as a result of the Formal Warning took place on June 21, 1991. Plaintiff now contends that both of these incidents were retaliation against him on account of his complaints of sexual harassment by Swadow. However, the specific reference in the Charge to the date of June 24, 1991 suggests that the retaliation of which plaintiff was complaining relates to another incident. According to plaintiff, on that date Johannson and Swadow presented plaintiff with a revised Formal Warning for his signature. When plaintiff refused to sign the document unless he could first make a photocopy of it, Johannson allegedly "fired" plaintiff by demanding his Company identification card and telling him to "pack up, and get out." Plaintiff's employment with BG & E was not in fact terminated at that time, and plaintiff eventually signed the document after Johannson permitted him to first make handwritten notes of its contents. The record clearly reveals that plaintiff's employment status with the Company was not adversely affected in any way as a result of the incident which occurred on June 24, 1991.

conduct to be sexual harassment because of the "strange look" which Swadow had at the time and because "he [Swadow] had been told by me and others not to do that kind of thing." [13] On another occasion the following month, while Swadow and plaintiff were discussing a particular photographic negative, Swadow allegedly said "something like orientation is subjective and gave [plaintiff] a very peculiar look." . In his deposition, plaintiff testified that he took this comment to be a reference to Swadow's sexual orientation.

In August of 1993, the Company decided that approximately $50 million in annual costs needed to be eliminated from its budget. The Company thus directed all department managers, including Edwards, to find areas in their respective departments which could be cut in order to achieve the desired reduction in costs. In October of 1993, these efforts resulted in a large-scale reorganization and reduction in work force which eliminated the positions held by some 1,100 of BG & E's 9,100 employees.

On October 19, 1993, as part of this reorganization and reduction in work force, the entire Photographic Services Unit was abolished and all 13 positions in the Unit were eliminated, including those held by both plaintiff and Swadow. The decision to eliminate the Photographic Services Unit was made by Edwards and was based upon an internal audit [14] which had concluded that the Company could save in the range of $100,000 to $200,000 annually by contracting out the work performed by the Unit.[15]

Although his position was terminated on October 19, 1993, plaintiff was not at that time discharged from BG & E's employment. Rather, the uncontradicted evidence of record here reveals that plaintiff participated in BG & E's Career Transition Center from October 19, 1993 until January 31, 1994, during which time plaintiff not only continued to receive his full salary and all regular employee benefits, but also continued to accrue employment time for pension and benefits purposes.

On December 23, 1993, plaintiff filed this civil action against BG & E in this Court, alleging claims of sex discrimination and retaliation under Title VII. Following the completion of extensive discovery, BG & E has moved for summary judgment as to all of plaintiff's claims.

## II

### Summary Judgment Principles

■ It is well established that a defendant moving for summary judgment bears the burden of showing the absence of any genuine issue of material fact and that it is entitled to judgment as a matter of law. *Barwick v. Celotex,* 736 F.2d 946, 958 (4th Cir. 1984). Where, as here, the nonmoving party will bear the ultimate burden of persuasion at trial, "the burden on the moving party [at the summary judgment stage] may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). One of the purposes of Rule 56 of the Federal Rules of Civil Procedure is to require a plaintiff, in advance of trial and after a motion for summary judgment has been filed and properly supported, to come forward with some minimal facts to show that the defendant in the case may be liable under the claims alleged. Rule 56(e). If the nonmoving party "fail[s] to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," then "the plain language of Rule 56(c)

---

**13.** Plaintiff also testified in his deposition that Swadow "regularly" commented on plaintiff's appearance or clothing, saying for example that a particular shirt worn by plaintiff was "bright and cheery" or that he had been admiring plaintiff's outfit "from afar."

**14.** The audit was conducted by Richard Bonney, a supervisor in Edwards's Department, in conjunction with a representative from the Company's Purchasing Department.

**15.** In an affidavit submitted in support of defendant's motion for summary judgment, Edwards states that the decision to contract out the work formerly performed by the Photographic Services Unit has actually resulted in annual savings to the Company in excess of $400,000. Plaintiff has not disputed any of defendant's figures in this regard.

mandates the entry of summary judgment." *Catrett*, 477 U.S. at 323, 322, 106 S.Ct. at 2552, 2552.

While the facts and all reasonable inferences drawn therefrom must be viewed in the light most favorable to the party opposing the motion, *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1985), "when the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matusushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). " 'A mere scintilla of evidence is not enough to create a fact issue; there must be evidence on which a jury might rely.' " *Barwick v. Celotex Corp.*, 736 F.2d 946, 958–59 (4th Cir.1984), (quoting *Seago v. North Carolina Theaters, Inc.*, 42 F.R.D. 627, 640 (E.D.N.C.1966), *aff'd*, 388 F.2d 987 (4th Cir.1967)). Moreover, only disputed issues of *material* fact, determined by reference to the applicable substantive law, will preclude the entry of summary judgment. "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

In the absence of such a minimal showing by a plaintiff, a defendant should not be required to undergo the considerable expense of preparing for and participating in a trial. *See Anderson*, 477 U.S. at 256–57, 106 S.Ct. at 2514–15; *Catrett*, 477 U.S. at 323–24, 106 S.Ct. at 2553. Indeed, the Fourth Circuit has stated that, with regard to motions for summary judgment, the district courts have "an affirmative obligation ... to prevent 'factually unsupported claims and defenses' from proceeding to trial." *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir.1987) (quoting *Catrett*, 477 U.S. at 323–24, 106 S.Ct. at 2553).

Applying these principles to the facts of record here, this Court has concluded that defendant's motion for summary judgment must be granted.

## III

### Discussion

Before considering the merits here, the Court must first address an important threshold question, namely, whether same-gender sexual harassment is actionable under federal law. Specifically, the issue which has been raised here by defendant BG & E in its motion for summary judgment is whether the alleged sexual harassment of a male employee by his male supervisor constitutes prohibited discrimination on the basis of sex under Title VII of the Civil Rights Act of 1964. No reported decision of the Fourth Circuit has addressed this issue.

### (a)

### Same–Gender Sexual Harassment

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e–2(a)(1). In *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), the Supreme Court recognized for the first time that "a plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive working environment." *Id.* at 66, 106 S.Ct. at 2405.[16] The Court reasoned that an employer who creates or condones a work environment which is discriminatorily hostile or abusive to members of a protected class, such as blacks or women, is thereby discriminating "with respect to ... terms [and] conditions ... of employment." *Id.* Title VII thus affords employees the right to work in an environment free from "discriminatory intimidation, ridicule, and insult." *Id.* at 65, 106 S.Ct. at 2405. Following the lead of several circuit courts of appeals, the Supreme Court further held that "unwelcome sexual advances that create an offensive or

---

16. Sexual misconduct directly linked to the grant or denial of an economic *quid pro quo* also violates Title VII. *Vinson*, 477 U.S. at 65, 106 S.Ct. at 2404–05. In this case, however, plaintiff has neither alleged nor argued that Swadow's conduct in any way constituted *quid pro quo* sexual harassment.

hostile working environment" may form the basis of a claim of sex discrimination under Title VII. *Id.* at 64, 106 S.Ct. at 2404; *accord Katz v. Dole,* 709 F.2d 251 (4th Cir. 1983); *Bundy v. Jackson,* 641 F.2d 934 (D.C.Cir.1981).

■ However, not all sexual harassment is actionable under Title VII. "For sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create a hostile or abusive work environment.'" *Vinson,* 477 U.S. at 67, 106 S.Ct. at 2406 (quoting *Henson v. Dundee,* 682 F.2d 897, 904 (11th Cir.1982)). In *Harris v. Forklift Sys.,* —— U.S. ——, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), the Court expressly reaffirmed its decision in *Vinson,* noting that the standard set forth in that opinion "takes a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury." *Id.* at ——, 114 S.Ct. at 370. The issue before the Court in *Harris* was "whether conduct, to be actionable as 'abusive work environment' harassment ..., must seriously affect an employee's psychological well-being or lead the plaintiff to suffer injury." *Id.* Rejecting any such requirement as not being supported by the language of Title VII, the Supreme Court in *Harris* held that "[a] discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees'

job performance, discourage employees from remaining on the job, or keep them from advancing their careers." *Id.*

■ It is thus well-established by *Vinson* and *Harris* that Title VII prohibits the pervasive and abusive sexual harassment of a female employee by a male supervisor or coworker. *Vinson* and *Harris* did not, however, address the viability under Title VII of a claim of same-gender sexual harassment. Title VII by its terms prohibits sex discrimination, not sexual harassment.[17] Neither *Vinson* nor *Harris* discussed in any significant detail the doctrinal basis for classifying sexual harassment as sex discrimination.[18] In *Vinson,* the Court merely stated that "[w]ithout question, when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex." *Id.* at 64, 106 S.Ct. at 2404. It has been suggested that the "discrimination" which brings a claim of sexual harassment within the scope of Title VII arises from "the differentiating libido" of the alleged harasser. *Vinson,* 760 F.2d at 1333 n. 7 (Bork, J., dissenting from denial of rehearing *en banc*). In other words, the male supervisor who subjects a female subordinate to unwanted sexual advances or demands has imposed an undue burden upon that female employee which, "but for" her gender, he would not have imposed upon her and which he presumably would not have placed on a similarly situated male subor-

17. Courts have recognized that the word "sex" as used in Title VII means, in effect, "gender." *See, e.g., Ulane v. Eastern Airlines, Inc.,* 742 F.2d 1081, 1085 (7th Cir.1984), *cert. denied,* 471 U.S. 1017, 105 S.Ct. 2023, 85 L.Ed.2d 304 (1985); *Holloway v. Arthur Andersen & Co.,* 566 F.2d 659, 662–63 (9th Cir.1977). Thus, courts have consistently held that Title VII does not prohibit discrimination on the basis of sexual orientation or preference; *see, e.g., Williamson v. A.G. Edwards & Sons, Inc.* 876 F.2d 69 (8th Cir.1989), *cert. denied,* 493 U.S. 1089, 110 S.Ct. 1158, 107 L.Ed.2d 1061 (1990); *DeSantis v. Pacific Tel. & Tel. Co.,* 608 F.2d 327, (9th Cir.1979); nor discrimination on the basis of "sexual identity;" *see, e.g., Ulane,* 742 F.2d at 1084–85 (transsexual employee fired for having sex change operation could not maintain cause of action under Title VII); *Powell v. Read's, Inc.,* 436 F.Supp. 369, 371 (D.Md.1977) (same); nor "sexual harassment" based on a belief that the victim is homosexual.

*Dillon v. Frank,* 1992 WL 5436, at *7, 1992 U.S.App.LEXIS 766, at 21 (6th Cir.1992).

18. Indeed, some judges and commentators have criticized "the awkwardness of classifying sexual advances as 'discrimination.'" *Vinson v. Taylor,* 760 F.2d 1330, 1333 n. 7 (D.C.Cir.1985) (Bork, J., joined by Scalia and Starr, JJ., dissenting from denial of rehearing *en banc*), *aff'd on other grounds sub nom. Meritor Savings Bank v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)); *see also, e.g.,* E. Paul, *Sexual Harassment as Sexual Discrimination: A Defective Paradigm,* 8 Yale L. & Pol'y Rev. 333 (1990) (arguing that "[t]he subsumption of sexual harassment under Title VII's ban on sex discrimination in employment" has no basis in either the language or the legislative history of Title VII, generates numerous doctrinal difficulties and anomalies, and should be reconsidered and rejected in favor of a new common law tort of sexual harassment).

dinate. In *Harris*, the Supreme Court repeatedly emphasized that it had not in *Vinson* moved away from a disparate treatment or "but for" theory of sexual harassment as sex discrimination. *See Harris,* —— U.S. at ——, 114 S.Ct. at 371 (Title VII violated only if *"discriminatory* conduct was so severe or pervasive that it created a work environment abusive to employees *because of* their ... gender"); *id.* (*"discriminatory* intimidation, ridicule, and insult"); *id.* ("[a] *discriminatorily* abusive work environment"); *compare id.* at ——, 114 S.Ct. at 372 ("The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.") (Ginsburg, J., concurring).

Insofar as the claim at issue here is concerned, the Supreme Court's discussion in *Vinson* and *Harris* of the doctrinal basis for sexual harassment raises almost as many questions as it answers. For example, as several of the courts of appeals have recognized in *dicta,* the sexual harassment of an employee of either gender by a bisexual harasser would presumably fall without the scope of prohibited conduct under Title VII. *See Rabidue v. Osceola Refining Co.,* 805 F.2d 611, 620 (6th Cir.1986), *cert. denied,* 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 823 (1987); *Henson v. City of Dundee,* 682 F.2d 897, 902 (11th Cir.1982); *Bundy v. Jackson,* 641 F.2d 934, 942 n. 7 (D.C.Cir.1981); *but see Chiapuzio v. BLT Operating Corp.,* 826 F.Supp. 1334, 1337 (D. Wyoming 1993) ("the equal harassment of both genders does not escape the purview of Title VII"). " 'Taking

the point one step further, it also seems peculiar to call sexual harassment of a male by a male, or [of] a female by a female, sex discrimination.... What the harasser is really doing is preferring or selecting some one member of his [own] gender for sexual attention, however unwelcome that attention may be to its object. He certainly does not despise the entire group, nor does he wish to harm its members, since he is a member himself and finds others of the group sexually attractive.' " *Chiapuzio,* 826 F.Supp. at 1337 n. 1 (quoting E. Paul, *supra,* 8 Yale L. & Pol'y Rev. at 351–52).

Until recently, the few federal courts which had addressed this issue squarely had consistently held, albeit without extensive discussion, that Title VII prohibits same-gender sexual harassment.[19] However, on July 29, 1994, the United States Court of Appeals for the Fifth Circuit handed down its opinion in *Garcia v. Elf Atochem North America,* 28 F.3d 446 (5th Cir.1994). In that case, the Fifth Circuit flatly held that " '[h]arassment by a male supervisor against a male subordinate does not state a claim under Title VII even though the harassment has sexual overtones.' " 28 F.3d at 451–52 (quoting *Giddens v. Shell Oil Co.,* 12 F.3d 208 (5th Cir.1993)).[20] To date, *Garcia* is the only reported appellate opinion to directly address this issue.

In reaching its conclusion in *Garcia,* the Fifth Circuit cited and apparently relied on *Goluszek v. Smith,* 697 F.Supp. 1452, 1456 (N.D.Ill.1988). *Goluszek,* a male, sued his former employer under Title VII, alleging

**19.** Prior to *Garcia,* at least two federal district courts had held, without much discussion, that same-gender sexual harassment was within Title VII's prohibition of sex discrimination. *See Joyner v. AAA Cooper Trans.,* 597 F.Supp. 537, 541 (M.D.Ala.1983), *aff'd without opinion,* 749 F.2d 732 (11th Cir.1984) (table); *Wright v. Methodist Youth Services, Inc.,* 511 F.Supp. 307, 309–10 (N.D.Ill.1981). As late as 1990, *Joyner* and *Wright* were cited as the only two prior reported decisions "dealing with unwelcome homosexual advances." *Parrish v. Washington Nat'l Ins. Co.,* 1990 WL 165611, at *7 n. 2, 1990 U.S. Dist. LEXIS 13934, at 8–9 n. 2 (N.D.Ill. Oct. 16, 1990). In *Parrish,* the Court stated in *dicta* that "unwelcome homosexual advances, like unwelcome heterosexual advances, are actionable under Title VII." *Id.* at *7 n. 2, at 9 n. 2. As have a

number of commentators over the years, the Court in *Parrish* accepted without extensive scrutiny the rationale of both *Joyner* and *Wright* that "[i]f a plaintiff complains of unwanted homosexual advances, the offending conduct is based on the employer's sexual preference and necessarily involved the plaintiff's gender, for an employee of the non-preferred gender would not inspire the same treatment." *Id.; see, e.g.,* S. Estrich, *Sex at Work,* 1991 Stanford L.Rev. 813, 819 & n. 18; K. Anderson, Note, *Employer Liability Under Title VII for Sexual Harassment After Meritor Savings Bank v. Vinson,* 1987 Colum.L.Rev. 1258, 1259 n. 13.

**20.** The Fifth Circuit's opinion in *Giddens* was not published and is not available from any electronic database or other service.

that he had been the victim of sexual harassment by several of his male co-workers and that his employer had failed to remedy and control the situation after Goluszek had made repeated complaints. 697 F.Supp. at 1453–55. Although the Court in *Goluszek* recognized that "a wooden application of the verbal formulations created by the courts would salvage Goluszek's sexual-harassment claim," the Court refused to do so and instead "adopt[ed] a reading of Title VII consistent with the underlying concerns of Congress." 697 F.Supp. at 1456. Elaborating, the Court said:

> Simply stated, the defendant's conduct was not the type of conduct Congress intended to sanction when it enacted Title VII. The goal of Title VII is equal employment opportunity. That goal is accomplished in part by imposing an affirmative duty on employers to maintain a working environment free of discriminatory intimidation. The discrimination Congress was concerned about when it enacted Title VII is one stemming from an imbalance of power and an abuse of that imbalance by the powerful which results in discrimination against a discrete and vulnerable group. Title VII does not make all forms of harassment actionable, nor does it even make all forms of verbal harassment with sexual overtones actionable. The "sexual harassment" that is actionable under Title VII "is the exploitation of a powerful position to impose sexual demands or pressures on an unwilling but less powerful person." Actionable sexual-harassment fosters a sense of degradation in the victim by attacking their [*sic*] sexuality. In effect, the offender is saying by words or actions that the victim is inferior because of the victim's sex.

> During the times relevant to his claim, Goluszek was a male in a male-dominated environment.... The argument that Goluszek worked in an environment that treated males as inferior consequently is not supported by the record. In fact, Goluszek may have been harassed "because"

he is a male, but that harassment was not of a kind which created an anti-male environment in the workplace.

697 F.Supp. at 1456 (cits. omitted).

Since the Fifth Circuit rendered its opinion in *Garcia*, only one other federal court has addressed the issue of Title VII's applicability to same-gender sexual harassment. In *Vandeventer v. Wabash Nat'l Corp.*, 867 F.Supp. 790 (N.D.Ind.1994), Chief District Judge Allen Sharp followed *Garcia* and *Goluszek* and dismissed a plaintiff's Title VII claims of sexual harassment on the ground that "[s]ame-sex harassment is not actionable under Title VII." *Vandeventer, supra* at 793. Chief Judge Sharp expressed his "agree[ment] with the *Goluszek* analysis that Title VII is aimed at a gender-biased atmosphere; an atmosphere of oppression by a 'dominant' gender." *Id.*

Following its review of the pertinent authorities discussed hereinabove, this Court has concluded that it will follow and apply in this case the reasoning of the Fifth Circuit in *Garcia* and that of two different district courts in *Vandeventer* and *Goluszek*. Accordingly, this Court holds that Title VII does not provide a cause of action for an employee who claims to have been the victim of sexual harassment by a supervisor or co-worker of the same gender. Title VII prohibits discriminatory conduct on the basis of gender and "evinces a congressional intent 'to strike at the entire spectrum of *disparate treatment of men and women.*'" *Vinson,* 477 U.S. at 64, 106 S.Ct. at 2404 (quoting *Los Angeles Dept. of Water & Power v. Manhart,* 435 U.S. 702 707 n. 13, 98 S.Ct. 1370, 1375 n. 13, 55 L.Ed.2d 657 (1978)) (emphasis added). Where, as here, the alleged harasser and the alleged victim are both of the same gender, the language of the statute would be strained beyond its manifest intent were the Court to hold that under these facts there has been discrimination "because of ... sex".[21]

For all these reasons, this Court concludes that plaintiff has failed to state in this case a viable claim of sex discrimination, and that

---

**21.** Plaintiff has not here argued that Title VII should encompass same-gender sexual harassment because that statute encompasses "same-race racial harassment." This court is satisfied that "racial harassment" is not a proper analogy for "sexual harassment" in the Title VII context. *See* J. Thorpe, Note, *Gender–Based Harassment,* 1990 Duke L.J. 1361, 1378 n. 80.

defendant is entitled to summary judgment in its favor as to that claim.

 Alternatively, even assuming that Title VII's prohibition of sex discrimination encompasses same-gender sexual harassment, this Court finds and concludes that plaintiff has on the present record failed to establish that he was discriminated against "because of" his sex. That the harassment complained of occurred "because of" the plaintiff's sex is an indispensable element of a claim under Title VII. *See Swentek v. USAIR, Inc.*, 830 F.2d 552, 557 (4th Cir. 1987); *Henson v. Dundee*, 682 F.2d 897, 903–04 (11th Cir.1982) (collecting cases); *Polly v. Houston Lighting & Power Co.*, 825 F.Supp. 135 (S.D.Tex.1993).

In *Polly*, a case which was decided before *Garcia*, the Court noted that "[t]he question of Title VII's applicability to sexual harassment of one by another of the same sex appears to be one of first impression in this circuit." 825 F.Supp. at 136.[22] Although the Court stated that "the majority of courts considering the issue have refused to limit Title VII's application to harassment of a female by a male," *id.* 136–37 (citing *Joyner* and *Wrignt* ), the Court ultimately concluded that the issue need not be decided, "because, assuming without deciding, that Title VII does apply to sexual harassment of a male by his male co-workers, [the plaintiff] has failed to produce summary judgment evidence sufficient to raise a fact issue on the existence of an essential element of his Title VII [claim]." *Id.* at 137. Specifically, the Court held that the plaintiff had "not shown that, *but for* his being male, he would not have been treated by his co-workers in the manner that he was." *Id.* at 138 (emphasis in original).

The analysis made by the Court in *Polly* is equally applicable here. Plaintiff has neither alleged nor argued that he was treated differently from other BG & E employees of

either gender. To the contrary, the record here indicates that Swadow was crude, insensitive and offensive to all of his employees, as well as to other persons not employed by BG & E. Evidence exists that Swadow had earlier subjected a female to sexual harassment. The theory advanced by plaintiff here is that Swadow, a married man with children, was bi-sexual. None of the alleged incidents of sexual harassment by Swadow involved implicit or explicit requests or demands for sexual favors. Indeed, many of the incidents relied upon do not appear at all to have even been "sexual" in nature, and several others involved essentially trivial conduct which would not in any event be actionable under Title VII. According to plaintiff's own deposition testimony, Swadow never asked that plaintiff go out with him on a "date," and Swadow never touched plaintiff in a sexual manner.

This Court has concluded that no reasonable juror could find on the present record that Swadow singled out and targeted plaintiff for harassment on account of plaintiff's sex. For this reason also, defendant's motion for summary judgment will be granted as to plaintiff's claim of sex discrimination.[23]

(b)

*Retaliation*

 Plaintiff has also asserted in this case a claim of retaliation. Plaintiff's failure to make out a successful sexual harassment claim does not necessarily prevent him from prevailing on a claim of retaliation based on a complaint of harassment. *Kidwai v. McDonald's Corp.*, 1994 WL 136971, 1994 U.S.App. LEXIS 7799, at 11 (4th Cir. Apr. 18, 1994); *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 357 n. 1 (4th Cir.1985) ("[a]n underlying discrimination charge need not be meritorious for a plaintiff to prevail on a claim of retaliation"). In order to make out a *prima facie* claim of retaliation, plaintiff

**22.** Presumably, the *Polly* court would now be bound by *Garcia*, since that court is within the Fifth Circuit.

**23.** Other questions which arise on the record here are whether the alleged harassing acts were sufficiently pervasive and continuous to create an abusive working environment, whether they were too isolated and trivial to be actionable, whether

defendant BG & E took effective action to correct the situation once it was brought to the attention of management, and whether plaintiff's claims asserted under Title VII are barred in whole or in part by limitations. In view of the Court's rulings on the other issues presented, it is not necessary to address these additional questions.

must show: (1) that he engaged in protected activity; (2) that his employer took adverse employment action against him; and (3) that there was a sufficient causal connection between the protected activity and the adverse employment action. *McNairn v. Sullivan,* 929 F.2d 974, 980 (4th Cir.1991); *Magnuson v. Peak Tech. Services,* 808 F.Supp. 500, 515 (E.D.Va.1992).

■ Applying these principles to the facts of record here, this Court has concluded that plaintiff has failed to make out a *prima facie* claim of unlawful retaliation under Title VII. Specifically, plaintiff has failed to show that defendant BG & E took any adverse employment action against him. Plaintiff's principal contention is that BG & E discharged him on October 19, 1993 in retaliation for his repeated complaints concerning Swadow's alleged harassment and for his filing of a Charge with the EEOC. However, the entire Photographic Services Unit was abolished in October of 1993 as a part of a reduction in its work force undertaken by BG & E. The positions of both Swadow and plaintiff were eliminated. Nevertheless, plaintiff was not discharged at the time. He received full salary and benefits until January of 1994 and could have continued his employment thereafter. Instead, on January 31, 1994, plaintiff chose to voluntarily terminate his employment.

According to the affidavit of Linda Miller, Manager of Employee Services for BG & E, plaintiff could have continued to participate in the Transition Center program, with continued full salary and benefits plus tuition reimbursement for up to 26 weeks following January 1, 1994, or until he secured another position with BG & E, which ever occurred first. Instead, as revealed by Miller's affidavit, plaintiff *voluntarily* chose, effective January 31, 1994, to receive a lump sum payment equivalent to thirty weeks salary in lieu of his continued participation in the Transition Center program. Although he has had ample opportunity to do so, plaintiff has not disputed or otherwise responded to these facts established by the record here.[24] At

the time of the filing of this suit by plaintiff on December 23, 1993, plaintiff's employment with BG & E had not as yet been terminated. Plaintiff's subsequent, voluntary decision to discontinue his participation in BG & E's Transition Center program cannot give rise to a viable claim of retaliatory discharge under Title VII. *See Diamond v. T. Rowe Price Assoc., Inc.,* 852 F.Supp. 372, 397 (D.Md.1994).

Faced with an inability to rely on his alleged discharge to support his claim of retaliation, plaintiff has argued in his opposition to the pending motion that the various other instances of allegedly retaliatory conduct described hereinabove provide an alternative basis for his claim of retaliation. There is no merit to this contention. Plaintiff has failed to show that any of the allegedly retaliatory acts of Swadow or of other BG & E officials were "adverse employment actions" undertaken in retaliation for protected activity. As this Court has previously recognized, the term "adverse employment action" refers in this context to " 'ultimate employment decisions,' not 'interlocutory or mediate decisions having no effect upon employment conditions.' " *Raley v. Board of St. Mary's County Comm'rs,* 752 F.Supp. 1272, 1281 (D.Md. 1990) (quoting *Page v. Bolger,* 645 F.2d 227, 233 (4th Cir.), *cert. denied,* 454 U.S. 892, 102 S.Ct. 388, 70 L.Ed.2d 206 (1981)).

As indicated hereinabove, plaintiff was not discharged from his employment. Nor has he been able to point to any facts in the record which support his contention that he was subjected to some other "adverse employment action." The Formal Warning was just that, a warning, and in any event was eventually removed from plaintiff's personnel record. Here, as in *Raley,* "[t]he touchings and verbal comments [complained of by plaintiff] were not employment decisions." *Id.* at 1278. Moreover, "[m]any of [plaintiff]'s allegations can be attributed to an increase of predictable tension in an office after a discrimination charge is filed. This is not adverse employment action." *Id.* at 1281 (citing *Geisler v. Folsom,* 735 F.2d 991, 994

---

24. Nor has there been any allegation or contention here by plaintiff that he was constructively discharged by BG & E.

(6th Cir.1984)). On the record here, this Court is satisfied that no reasonable jury could find on these facts that any adverse employment action was taken against plaintiff by Swadow or by any other BG & E official in retaliation for his complaints about Swadow's alleged sexual harassment. Plaintiff has accordingly not met his burden of proving a *prima facie* case of retaliation under Title VII.

Accordingly, defendant's motion for summary judgment will be granted as to all of plaintiff's claims. An appropriate Order will be entered by the Court.