**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

GEORGE E. HOPKINS, JR.,
Plaintiff-Appellant,

v.

BALTIMORE GAS AND ELECTRIC
COMPANY,
Defendant-Appellee.

No. 95-1209

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION; AMERICAN CIVIL
LIBERTIES UNION OF MARYLAND, INC.;
WOMEN'S LEGAL DEFENSE FUND;
NATIONAL WOMEN'S LAW CENTER;
EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,
Amici Curiae.

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Alexander Harvey, II, Senior District Judge.
(CA-93-4167-H)

Argued: September 28, 1995

Decided: March 5, 1996

Before WILKINSON, Chief Judge, and NIEMEYER and
HAMILTON, Circuit Judges.

_____

Affirmed by published opinion. Judge Niemeyer wrote the opinion for
the court only in parts I, III, and IV and wrote separately in part II.
Chief Judge Wilkinson and Judge Hamilton join in parts I, III, and IV

of the opinion. Chief Judge Wilkinson wrote a concurring opinion in which Judge Hamilton joins.

_____

**COUNSEL**

**ARGUED:** Lee David Hoshall, Baltimore, Maryland, for Appellant. Mary Lee Clark, Office of the General Counsel, EQUAL EMPLOY-MENT OPPORTUNITY COMMISSION, Washington, D.C., for Amicus Curiae EEOC. Sara Louise Mandelbaum, Women's Rights Project, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York, for Amici Curiae Women's Rights Project, et al. Joseph Michael McGuire, SHAWE & ROSENTHAL, Baltimore, Maryland, for Appellee. **ON BRIEF:** John P. Rowe, Acting General Counsel, Gwendolyn Young Reams, Associate General Counsel, Carolyn L. Wheeler, Assistant General Counsel, Office of the General Counsel, EQUAL EMPLOYMENT OPPORTUNITY COMMIS-SION, Washington, D.C., for Amicus Curiae EEOC. Susan Goering, AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF MARYLAND, Baltimore, Maryland, for Amici Curiae Women's Rights Project, et al. Robert H. Ingle, III, SHAWE & ROSENTHAL, Baltimore, Maryland; L. Ellis Justis, Jr., BALTIMORE GAS & ELECTRIC COMPANY, Baltimore, Maryland, for Appellee.

_____

**OPINION**

NIEMEYER, Circuit Judge, writing for the court only in parts I, III, and IV:

George E. Hopkins, Jr., alleges in his complaint in this case that his male supervisor's comments and actions created a sexually hostile work environment in violation of Title VII of the Civil Rights Act of 1964. In granting the motion for summary judgment of Hopkins' employer, the district court held that Title VII does not provide a cause of action for an employee who has been subjected to sexual harassment by a supervisor of the same gender. We affirm the district court's judgment, but for the reason that Hopkins failed to make out a prima facie case of a hostile work environment.

2

I

From 1985 until 1993, Hopkins worked in the Photographic Services Unit of Baltimore Gas & Electric Company (BG&E) as a color photographic technician. His immediate supervisor was Ira Swadow. In October 1993, as part of a reduction in force and a company-wide reorganization, BG&E eliminated the Photographic Services Unit and its 13 positions, including those held by Hopkins and Swadow.

Hopkins contends that throughout his term of employment at BG&E, Swadow subjected him to discriminatory sexual harassment, creating a hostile work environment. Hopkins bases his claim on the following incidents:

> 1. Swadow frequently entered the men's bathroom when Hopkins was there alone. On one occasion in 1986, while Hopkins was at the urinal, Swadow pretended to lock the door and said, "Ah, alone at last." He walked towards Hopkins, making Hopkins feel "very uncomfortable."
>
> 2. In 1987, Swadow wrote "S.W.A.K., kiss, kiss," and drew small hearts on internal mail Hopkins received from his fiancee, a BG&E employee. On another occasion, Swadow added the word "Alternative" in front of the company name "Lifestyles" on a piece of mail addressed to Hopkins.
>
> 3. In February 1988, during a party given by Hopkins, Swadow suggested to a BG&E employee that Hopkins and his fiancee were getting married because she was pregnant. Upon Hopkins' engagement, Swadow told him that he would be "counting the months" to see when the baby arrives. Before Hopkins' marriage, Swadow occasionally asked him if he had gone on dates over the weekend and whether he had sex with anyone. Swadow also mentioned repeatedly that his children called him "Daddy," that it took a special person to be called "Daddy," and that he was sure Hopkins' son would never call Hopkins "Daddy."

3

4. At Hopkins' wedding on June 25, 1988, Swadow was the only man who attempted to greet Hopkins in the receiving line by kissing him.

5. Sometime before 1990, while Hopkins was leaning back on a table and speaking on the telephone, Swadow pivoted an illuminated magnifying lens over Hopkins' crotch, looked through it while pushing the lens down, and asked "Where is it?"

6. Sometime before 1990, Swadow asked Hopkins,"On a scale of one to ten, how much do you like me?" Hopkins felt that the question was inappropriate. He had previously told Swadow that he objected to Swadow's "sexual overtones."

7. Sometime before 1990, Swadow bumped into Hopkins and said, "You only do that so you can touch me."

8. Sometime before 1990, during a conversation with Hopkins and a vendor about a recent airplane crash, Swadow looked at Hopkins and said that in order to survive with burning fuel on the surface of the water, Swadow would "find a dead man and cut off his penis and breathe through that." Hopkins told Swadow that he was offended by such a "sick" statement.

9. In 1989 or 1990, while Hopkins was showing the color darkroom to a supervisor's female guest, Swadow came in and asked "Are you decent?"

10. In 1991, while preparing to leave on a business trip from Hopkins' home, Swadow found an unloaded gun in the house and pointed it at Hopkins.

11. On August 1, 1991, Swadow squeezed into the one-person revolving door to the darkroom with another employee. Upon exiting the door, Swadow looked at Hopkins, who was in the darkroom, and asked, "Was it as good

4

for you as it was for me?" The other employee looked very uncomfortable. Later, Swadow attempted to force himself into the same revolving door with Hopkins. He had made physical contact with Hopkins' back before Hopkins pushed Swadow away and told him that he "objected to it" and did not want to be in the darkroom with him.

12. Throughout 1993, Swadow regularly commented on Hopkins' appearance. For example, Swadow would say, "You look nice today," "You have a really pretty shirt on," or "You look so distinguished." Once he turned over Hopkins' tie and examined it.

13. On July 2, 1993, while Swadow and Hopkins were discussing a photographic negative, Swadow, with a"very peculiar" look on his face, commented that "orientation is subjective."

Late in 1989, Hopkins complained to his supervisors about Swadow's sexual harassment, particularly his inappropriate sexual comments and jokes. He identified the events described above in paragraphs 5 and 7. In response, BG&E conducted an internal investigation, which included interviews of Hopkins, Swadow, and nine other employees in the Photographic Services Unit. A manager's report concluded that "practically all of the Sections's employees engage in joking and comments of one kind or another" but that such comments were "not offensive" and were not"intended to be so." An employee case analyst, who could not conclude that Swadow's behavior was "sexually motivated," felt that Hopkins was trying to "hang" Swadow.

The matter was then referred to higher management, which assured Hopkins that Swadow was "under close scrutiny" and that "none of this would happen in the future." At the time, Hopkins appeared satisfied with BG&E's response. Without ultimately taking a position on whether Hopkins' charges were true, BG&E offered to interview him for a transfer to two different positions in other departments. Hopkins declined the offer out of a concern that his transfer would give his co-workers the impression that he was the one at fault.

Over a year later, Hopkins filed a charge of sexual discrimination with the Equal Employment Opportunity Commission (EEOC), and the EEOC issued a right to sue letter in September 1993. Hopkins filed this action in December 1993, alleging sexual harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964.

Following discovery, the district court granted BG&E's motion for summary judgment on both of Hopkins' claims. Hopkins v. Baltimore Gas & Elec. Co., 871 F. Supp. 822 (D. Md. 1994). The court concluded that same-gender sexual harassment is not actionable under Title VII and, alternatively, that the harassment of which Hopkins complained did not occur "because of" Hopkins' gender. Id. at 834-35. With respect to Hopkins' retaliation claim, the court concluded that he had failed to show any "adverse employment action." Id. at 836-37. This appeal followed.

II

Hopkins first argues that the district court erred in holding that same-gender sexual harassment is not actionable under Title VII. In entering summary judgment for BG&E, the district court concluded that Title VII does not provide a cause of action for an employee who has been subjected to sexual harassment by a supervisor or co-worker of the same gender. 871 F. Supp. at 834. The court's reasoning focused on Congress' purpose in enacting Title VII and the statute's language:

> Title VII prohibits discriminatory conduct on the basis of gender and "evinces a congressional intent `to strike at the entire spectrum of <u>disparate treatment of men and women</u>.'" Where, as here, the alleged harasser and the alleged victim are both of the same gender, the language of the statute would be strained beyond its manifest intent were the Court to hold that under these facts there has been discrimination "because of . . . sex".

Id. (alteration in original) (citations omitted).

In deciding the question of whether same-gender sexual harassment is actionable under Title VII, we begin with the applicable statutory

6

language. Title VII prohibits "an employer" from "discriminating against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Since Title VII's enactment, the meaning of the term "sex" as used in the Act has become the subject of judicial and academic debate. Viewed in the abstract, a prohibition of discrimination based on "sex" is broad and perhaps even undefinable. Arguably, such a prohibition might be read to preclude discrimination based on human psychological and physiological characteristics or on sexual orientation. It might also be read to prohibit all workplace sexual behavior or words and deeds having sexual content. Indeed, at oral argument, Hopkins' counsel argued that dirty jokes or sexually-based profanity spoken by a male supervisor to other male employees implicates the prohibitions of Title VII.

In the context of Title VII's legislative history, however, it is apparent that Congress did not intend such sweeping regulation. The suggestion that Title VII was intended to regulate everything sexual in the workplace would undoubtedly have shocked every member of the 88th Congress, even those most vigorously supporting passage of the Act. Detached from their historical setting, the terms of Title VII's prohibition of discrimination, "because of" an individual's "sex," stand only as "inert language, lifeless words," and, perhaps, even "playthings with which to reconstruct the Act." Romero v. International Terminal Operating Co., 358 U.S. 354, 379 (1959) (Frankfurter, J.). Accordingly, it becomes necessary to turn to Title VII's legislative history.

Just two days before the House of Representatives passed Title VII, it adopted an amendment adding "sex" as a prohibited basis for discrimination. Congressman Smith proposed the amendment to "do some good for the minority sex" by ensuring that women receive "as high compensation for their work as do the majority sex." 110 Cong. Rec. 2577 (1964). Congressman Celler opposed the amendment, arguing that the bill was already "all-embracing," covering "everybody in the United States" including "white men and white women and all Americans." Id. at 2578. Congresswoman Griffiths, however, responded that when a qualified white woman is denied a job because she is a woman, she has no recourse without the amendment. Id. at 2579. To combat such discrimination, the House adopted Congress-

7

man Smith's amendment, adding "sex" as a prohibited basis for discrimination.**1**

While Congress' particular focus in amending Title VII to prohibit discrimination on the basis of "sex" was to ensure equal employment rights for women, the Supreme Court has interpreted the Act's broad language to protect both men and women. See, e.g., Newport News Shipbuilding and Dry Dock Co. v. EEOC, 462 U.S. 669, 676 (1983) (holding that insurance plan that provided less extensive pregnancy benefits to married male employees than to married female employees discriminated against males in violation of Title VII). Examining the legislative history of the Pregnancy Discrimination Act, which amended Title VII in 1978, the Court in Newport News reasoned that even though "congressional discussion focused on the needs of female members of the work force . . . [t]his does not create a `negative inference' limiting the scope of the Act to the specific problem that motivated its enactment." Id. at 679; cf . McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 280 (1976) (holding that Title VII proscribes racial discrimination against whites "upon the same standards" as racial discrimination against nonwhites).

_____

**1** Because Congress intended that the term "sex" in Title VII mean simply "man" or "woman," there is no need to distinguish between the terms "sex" and "gender" in Title VII cases. Consequently, courts, speaking in the context of Title VII, have used the term "sex" and "gender" interchangeably to refer simply to the fact that an employee is male or female. See, e.g., Price Waterhouse v. Hopkins, 490 U.S. 228, 239-41 (1989) (using "gender" and "sex" interchangeably). Indeed, the use of "sex" and "gender" interchangeably may impose a useful limit on the term "sex," which otherwise might be interpreted to include sexual behavior. Some academic writers, however, seek to maintain or to heighten a distinction between the terms "sex" and "gender," asserting that "gender" connotes cultural or attitudinal characteristics distinctive to the sexes, as opposed to their physical characteristics. See, e.g., Mary Anne C. Case, Disaggregating Gender From Sex and Sexual Orientation: The Effeminate Man in the Law and Feminist Jurisprudence, 105 Yale L. J. 1 (1995) ("gender [is] to sex what masculine and feminine are to male and female"). See also JEB v. Alabama, 114 S. Ct. 1419, 1436 n.1 (1994) (Scalia, J., dissenting). While it may be useful to disaggregate the definition of "gender" from "sex" for some purposes, in this opinion we make no such effort, using the terms interchangeably to refer to whether an employee is a man or a woman.

8

In 1986, the Supreme Court expanded the scope of Title VII in yet another direction by recognizing that the prohibition against "discrimination" protects employees from "discriminatory sexual harassment." Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 64-66 (1986) (emphasis added). Noting that "the language of Title VII is not limited to `economic' or `tangible' discrimination" but rather "evinces a congressional intent `to strike at the entire spectrum of disparate treatment of men and women' in employment," the Meritor Court announced that "when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor`discriminate[s]' on the basis of sex." Id. at 64 (alteration in original) (citation omitted). Thus, the Court established that a claim of "hostile environment" sex discrimination is actionable under Title VII. Id. at 73.

While the Supreme Court has interpreted Title VII to protect both men and women against workplace sexual harassment by the opposite sex, it has not specifically addressed the question of whether the Act's prohibitions apply when the harasser and the victim are the same sex. The EEOC and several circuits, however, appear to agree that Title VII may cover same-sex harassment.

The EEOC Compliance Manual states that the respective sexes of the harasser and the victim are irrelevant in determining whether Title VII has been violated:

> The victim does not have to be of the opposite sex from the harasser. Since sexual harassment is a form of sex discrimination, the crucial inquiry is whether the harasser treats a member or members of one sex differently from members of the other sex. The victim and the harasser may be of the same sex where, for instance, the sexual harassment is based on the victim's sex (not on the victim's sexual preference) and the harasser does not treat the employees of the opposite sex the same way.

EEOC Compliance Manual, § 615.2(b)(3). Although the courts are not bound by the EEOC's interpretation of Title VII, it is nevertheless appropriate to consider the EEOC's interpretation because of the EEOC's charge to enforce the Act. See Meritor , 477 U.S. at 65.

9

The District of Columbia Circuit has acknowledged the possibility of actionable sexual harassment under Title VII where "a subordinate of either gender" is harassed "by a homosexual superior of the same gender." Barnes v. Costle, 561 F.2d 983, 990 n.55 (D.C. Cir. 1977). That same court subsequently reiterated, "in each instance the question is . . . would the complaining employee have suffered the harassment had he or she been of a different gender?" Bundy v. Jackson, 641 F.2d 934, 942 n.7 (D.C. Cir. 1981). Similarly, in Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430 (7th Cir. 1995), the Seventh Circuit commented that "[s]exual harassment of women by men is the most common kind, but we do not mean to exclude the possibility that sexual harassment of men by women, or men by other men, or women by other women would not also be actionable in appropriate cases." See also Steiner v. Showboat Operating Co., 25 F.3d 1459, 1464 (9th Cir. 1994) (commenting that "we do not rule out the possibility that both men and women . . . have viable claims against [a male supervisor] for sexual harassment"), cert. denied , 115 S. Ct. 733 (1995); Saulpaugh v. Monroe Community Hosp., 4 F.3d 134, 148 (2d Cir. 1993) (Van Graafeiland, J., concurring) (arguing that "harassment is harassment regardless of whether it is caused by a member of the same or opposite sex"), cert. denied, 114 S. Ct. 1189 (1994); cf. Morgan v. Massachusetts Gen. Hosp., 901 F.2d 186, 192 (1st Cir. 1990) (holding that homosexual advances by male co-worker were not sufficiently severe or pervasive to be actionable).

Thus far, only the Fifth Circuit has expressly refused to recognize a cause of action for same-gender sexual harassment. See Garcia v. Elf Atochem North America, 28 F.3d 446, 451-52 (5th Cir. 1994). In Garcia, the court held, without any discussion, that "`[h]arassment by a male supervisor against a male subordinate does not state a claim under Title VII even though the harassment has sexual overtones'" because "`Title VII addresses gender discrimination.'" Id. at 451-52 (quoting Giddens v. Shell Oil Co., No. 92-8533, slip op. at 1-2 (5th Cir. Dec. 6, 1993) (reasoning that employee "did not allege how his employer treated him differently because he was a male") (unpublished), cert. denied, 115 S. Ct. 311 (1994)). Garcia also cited Goluszek v. Smith, 697 F. Supp. 1452, 1453 (N.D. Ill. 1988), a case in which an "unsophisticated" male mechanic, who had "little or no sexual experience" and was "abnormally sensitive to comments pertaining to sex," had been teased about women by co-workers using

10

crude language and nude photographs. In <u>Goluszek</u>, the district court held that harassment by fellow male co-workers in a male-dominated environment "was not the type of conduct Congress intended to sanction when it enacted Title VII." <u>Id</u>. at 1456.

District courts across the country are deeply divided on whether Title VII applies to same-gender sexual harassment. **2** In the case before us, the district court concluded that same-gender sexual harassment is never actionable under Title VII. <u>Hopkins</u>, 871 F. Supp. at 834.

In addressing this issue, I do not find persuasive the reasoning of the Fifth Circuit in <u>Garcia</u> and those district courts that have concluded <u>categorically</u> that same-gender sexual harassment can never be actionable under Title VII. In aligning myself with those courts that have observed that same-gender sexual harassment may be actionable under Title VII in appropriate circumstances, I conclude that such a holding is required by the statutory language, understood in its historical context and as subsequently interpreted by the Supreme Court. While it is apparent from the historical record that Congress, in prohibiting sex discrimination, meant to prohibit discrimination only on the basis of the employee's status as a man or a woman, it is also clear from the statutory language itself that only the sex of the <u>employee</u> is relevant in determining whether Title VII is implicated. Title VII imposes no gender restriction for the person effecting the discrimination; it prohibits discriminatory conduct by an"employer," regardless of the employer's gender or the gender of those whose conduct imputes liability to the employer. Thus, the requisite causation of prohibited conduct is defined only by the status of the <u>employee</u> as a man or a woman.

_____

**2 <u>Compare</u>**, <u>e.g.</u>, <u>Sardinia v. Dellwood Foods, Inc.</u>, 1995 WL 640502 (S.D.N.Y. 1995) (holding that same-sex sexual harassment claims are actionable under Title VII) <u>and Griffith v. Keystone Steel & Wire</u>, 887 F. Supp. 1133 (C.D. Ill. 1995) (same) <u>and Raney v. District of Columbia</u>, 892 F. Supp. 283 (D.D.C. 1995) (same) <u>with Ashworth v. Roundup Co.</u>, 1995 WL 520699 (W.D. Wash. 1995) (holding that same-sex sexual harassment claims are <u>not</u> actionable under Title VII) <u>and Goluszek v. Smith</u>, 697 F. Supp. 1452 (N.D. Ill. 1988) (same) <u>and Myers v. City of El Paso</u>, 874 F. Supp. 1546 (W.D. Tex. 1995) (same).

11

It follows that in prohibiting sex discrimination solely on the basis of whether the employee is a man or a woman, Title VII does not reach discrimination based on other reasons, such as the employee's sexual behavior, prudery, or vulnerability. See McWilliams v. Fairfax County Bd. of Supervisors, No. 94-1607, slip op. at 7 (4th Cir. Jan. 9, 1996) (explaining that "because of . . . sex" in Title VII does not mean because of "the victim's known or believed prudery, or shyness, or other form of vulnerability to sexually-focused speech or conduct"). Similarly, Title VII does not prohibit conduct based on the employee's sexual orientation, whether homosexual, bisexual, or heterosexual. Such conduct is aimed at the employee's sexual orientation and not at the fact that the employee is a man or a woman.[3] Thus, as the Supreme Court observed in Price Waterhouse v. Hopkins, "[W]hile an employer may not take gender into account in making an employment decision (except in those very narrow circumstances in which gender is a [bona fide occupational qualification]), it is free to decide against a woman for other reasons." 490 U.S. 228, 244 (1989) (emphasis added).

Moreover, since the language of Title VII prohibits sex discrimination based solely on the employee's gender without consideration of the gender of the person effecting the discrimination, because of the holding in Meritor the Act must be construed also to prohibit sexual harassment against an employee because of that employee's gender, regardless of the harasser's gender. As we noted earlier, in Meritor the Supreme Court concluded that sexual harassment, which is sufficiently severe and pervasive to alter the conditions of employment, constitutes discrimination of the type prohibited by Title VII. I therefore conclude that sexual harassment of a male employee, whether by another male or by a female, may be actionable under Title VII if the basis for the harassment is because the employee is a man.

_____

[3] Recognizing that Title VII does not prohibit discrimination because of sexual orientation, several local civil rights laws have added "sexual orientation" as a proscribed basis of discrimination. See, e.g., Montgomery County Code, § 27-19(a) (prohibiting discrimination because of an individual's "race, color, religion, creed, ancestry, national origin, age, sex, marital status, handicap or sexual orientation" (emphasis added)).

12

The more difficult question arises as to what proof is necessary to demonstrate that harassment is because of the employee's gender and not for some other reason, particularly when the harasser and the victim are the same gender.

When someone sexually harasses an individual of the opposite gender, a presumption arises that the harassment is"because of" the victim's gender. This presumption is grounded on the reality that sexual conduct directed by a man, for example, toward a woman is usually undertaken because the target is female and the same conduct would not have been directed toward another male. See , e.g., Barnes, 561 F.2d at 90 (plaintiff "became target of her superior's sexual desires because she was a woman . . . . [N]o male employee was susceptible to such an approach"). But when the harasser and the victim are the same gender, the presumption is just the opposite because such sexually suggestive conduct is usually motivated by entirely different reasons.

Thus, when a male employee seeks to prove that he has been sexually harassed by a person of the same sex, he carries the burden of proving that the harassment was directed against him"because of" his sex. The principal way in which this burden may be met is with proof that the harasser acted out of sexual attraction to the employee. In McWilliams, slip op. at 6-7 n.5, we noted that a male employee who undertakes to prove sexual harassment directed at him by another male may use evidence of the harasser's homosexuality to demonstrate that the action was directed at him because he is a man. But we cautioned that proof of such homosexuality must include more than "merely suggestive" conduct. Id.

I recognize that conduct directed toward an employee of the same gender as the harasser can have sexual content or innuendo and, indeed, may be offensive. But unless such harassment is directed toward an employee "because of" his or her status as a man or a woman, it does not implicate Title VII. I reject the notion that when a man, for example, uses sexually oriented gestures and language, or engages in sexually perverse activity to harass another man, Title VII automatically imposes liability. Such conduct may constitute a common law tort, but, without more, it does not amount to discrimination against the employee because he is a man. "There perhaps `ought to

13

be a law against' . . . puerile and repulsive workplace behavior . . .
in order to protect the victims against its indignities and debilitations,
but . . . Title VII is not that law." McWilliams, slip op. at 8.

In sum, while harassment directed toward an individual employee
by another individual of the same gender may be actionable if it is
directed at the employee "because of" the employee's gender, the
plaintiff must overcome the presumption in that circumstance that the
harassment was not "because of" that employee's gender.

III

Regardless of whether Hopkins' same-gender sexual harassment is
actionable under Title VII, Hopkins still bears the burden of demon-
strating, in the context of this case, that Swadow's alleged harassment
was sufficiently severe or pervasive to create an objectively hostile or
abusive work environment and the harassment was directed at him
because of his sex.[4]

Not all sexual harassment that is directed at an individual because
of his or her sex is actionable. Title VII does not attempt "to purge
the workplace of vulgarity." Baskerville v. Culligan Int'l Co., 50 F.3d
428, 430 (7th Cir. 1995). As the Supreme Court recognized in Harris
v. Forklift Sys., Inc., 114 S. Ct. 367, 370 (1993), "Conduct that is not
severe or pervasive enough to create an objectively hostile or abusive
work environment--an environment that a reasonable person would
find hostile or abusive--is beyond Title VII's purview." See also
Meritor, 477 U.S. at 67 (recognizing that conduct amounts to action-
able sexual harassment only when it is "sufficiently severe or perva-
sive `to alter the conditions of [the victim's] employment and create
an abusive working environment'" (alteration in original) (citation
omitted)).

_____

[4] Generally, to establish a claim for sexual harassment under 42 U.S.C.
§ 2000e-2(a)(1), a plaintiff employee must prove that (1) the subject con-
duct was unwelcome; (2) it was based on the plaintiff's sex; (3) it was
sufficiently severe or pervasive to alter the plaintiff's conditions of
employment and to create an abusive work environment; and (4) it was
imputable on some factual basis to the employer. See Spicer v. Common-
wealth of Va., 66 F.3d 705, 710 (4th Cir. 1995) (en banc). But in this
case, elements (1) and (4) are not at issue.

14

In deciding whether the harassment to which Swadow allegedly subjected Hopkins was sufficiently severe or pervasive to bring it within Title VII's purview, we must examine the totality of the circumstances, including "[t]he frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 114 S. Ct. at 371. We recognize that the "line between a merely unpleasant working environment . . . and a hostile or deeply repugnant one" may be difficult to discern. Baskerville, 50 F.3d at 431 (overturning jury verdict for employee in Title VII suit because incidents did not amount to actionable sexual harassment and employer took adequate remedial measures). After carefully considering the entire record before us, however, we are convinced that the conduct of which Hopkins complains was neither sufficiently severe nor sufficiently pervasive to create an environment that a reasonable man would find hostile or abusive.

For his claim, Hopkins relies on conduct by Swadow that was temporally diffuse, ambiguous, and often not directed specifically at him. First, the incidents that Hopkins recounts occurred intermittently over a seven-year period, with gaps between incidents as great as a year. That alone suggests the absence of a condition sufficiently pervasive to establish Title VII liability. "A handful of comments spread over months is unlikely to have so great an emotional impact as a concentrated or incessant barrage." Baskerville, 50 F.3d at 431.

Second, Swadow's alleged conduct toward Hopkins was sexually neutral or, at most, ambiguous. According to Hopkins, Swadow bumped into him, positioned a magnifying glass over his crotch, flipped his tie over to see its label, gave him a congratulatory kiss in the receiving line at Hopkins' wedding, and stared at him in the bathroom. Notably, Hopkins has not asserted that Swadow ever made an overt sexual proposition or touched Hopkins in a sexual manner. While Swadow's conduct was undoubtedly tasteless and inappropriately forward, we cannot conclude that it was "of the type that would interfere with a reasonable person's work performance . . . to the extent required by Title VII." Morgan v. Massachusetts Gen. Hosp., 901 F.2d 186, 193 (1st Cir. 1990) (holding that allegations fell short of Title VII liability where male plaintiff claimed that male co-worker

15

stood behind him and bumped into him while he mopped, "peeped" at him in restroom, and asked him to dance at Christmas party).

Third, several of the incidents upon which Hopkins relies occurred in group settings, and only Hopkins subjectively perceives them to have been directed solely at him. On one occasion, Hopkins was offended by Swadow's comment during a group discussion concerning how to use a sexual organ to survive a plane crash. On another occasion, he was offended by Swadow's comment--"Was it as good for you as it was for me?"--made after Swadow forced himself into a revolving door with a third party.

While we do not approve of Swadow's apparent willingness to offend and provoke employees with his ambiguously sexual innuendos, Title VII was not designed to create a federal remedy for all offensive language and conduct in the workplace. When presented in other Title VII cases with conduct of the type alleged by Hopkins in this case, we have consistently affirmed summary judgment dismissing the claims. See, e.g., Dwyer v. Smith, 867 F.2d 184, 187-88 (4th Cir. 1989) (affirming directed verdict in Title VII case despite evidence that female police officer was subjected to pornographic material placed in her station mailbox and to fellow officers' sexually explicit conversations); Harris v. Clyburn, 1995 WL 56634, at *3 (4th Cir. 1995) (unpublished) (per curiam) (affirming summary judgment for employer where "only specific factual allegation of sexual harassment [was] occasional tickling [by her male superior] in the hallway"); Cobbins v. School Bd. of Lynchburg, Va., No. 90-1754, slip op. at 7-10 (4th Cir. Jan. 14, 1991) (unpublished) (per curiam) (holding that where male teacher asked female teacher out for a drink, asked her to perform tasks she perceived as secretarial, and struck her in a fight, purported harassment was not gender-based and was not sufficiently severe or pervasive). See also Baskerville, 50 F.3d at 430-31 (overturning verdict because evidence that her male superior called her "pretty girl," commented on her attire, and made "vulgar banter tinged with sexual innuendo" did not establish actionable Title VII claim).

Accordingly, we hold in this case that as a matter of law the conduct of which Hopkins complains, spread over seven years with significant time gaps between incidents, does not create a sufficiently

16

hostile environment on which to rest a Title VII claim. Because we conclude that Swadow's alleged conduct was not sufficiently severe or pervasive for Hopkins to establish a prima facie case of sexual harassment under Title VII, we do not reach the question of whether it was directed at Hopkins because of his sex.

IV

Hopkins also contends that the district court erred in dismissing his claim that BG&E retaliated against him for complaining to management about Swadow's offensive conduct and for filing an EEOC complaint that alleged discriminatory sexual harassment. The district court concluded that Hopkins did not need to prevail on his underlying discrimination claim to succeed on his retaliation claim, but that he had failed to show that BG&E had taken any adverse employment action against him. Hopkins, 871 F. Supp. at 835-37. We agree.

Title VII prohibits an employer from discriminating against an employee in retaliation for that employee's opposition to, or complaint about, an unlawful employment practice. 42 U.S.C. § 2000e-3(a). To establish a prima facie case of retaliation, Hopkins must show that (1) he engaged in protected activity; (2) his employer took adverse employment action against him; and (3) a sufficient causal connection existed between his protected activity and his employer's adverse employment action. See McNairn v. Sullivan, 929 F.2d 974, 980 (4th Cir. 1991).

The record in this case, considered in the light most favorable to Hopkins, reveals that BG&E's entire Photographic Services Unit, including both Swadow's and Hopkins' positions, were eliminated as part of a 1,100-employee reduction in force and corporate restructuring that took place in October 1993. Hopkins continued to receive a full salary and benefits until January 1994 and could have continued his employment with BG&E in another capacity had he not voluntarily chosen to terminate it.

In addition to his alleged discharge, Hopkins attempts to characterize various other employment actions as adverse. For example, Hopkins was advised by BG&E officials on more than one occasion that he should forget about Swadow's conduct and "put it behind" him. On

17

another occasion, Hopkins received a formal disciplinary warning for substituting a color print for an original--conduct that Hopkins denies --but the warning was subsequently removed from his personnel record. Both Hopkins and Swadow were required to undergo a "Fitness for Duty" psychological examination. Finally, although Hopkins' overall ratings on his evaluations remained the same after his complaints to management, Swadow wrote that Hopkins needed improvement in "job behavior" and "work relations."

We agree with the district court that no reasonable jury could find on these facts that Swadow or any other BG&E official took any adverse employment action against Hopkins because of his complaints about alleged sexual harassment. Hopkins was not discharged from his employment and the comments in question never amounted to or resulted in any adverse employment action.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

WILKINSON, Chief Judge, with whom HAMILTON, Circuit Judge, joins, concurring in part:

We are pleased to concur in parts I, III, and IV of Judge Niemeyer's opinion. Those sections ably demonstrate that every example of offensive and tasteless workplace conduct does not provide the basis of a cause of action under Title VII. See, e.g., Baskerville v. Culligan Int'l Co., 50 F.3d 428 (7th Cir. 1995). The discussion in part II on the actionability of same sex harassment, however, is quite unnecessary to the resolution of this case, and we do not concur in it.

Moreover, the inadvisability of undertaking such a discussion is underscored by Title VII itself. The general language used by Congress in Title VII makes its intentions with respect to the actionability of same sex conduct ambiguous at best. To expand the reach of Title VII to same sex harassment risks dragging a multitude of workplace conflicts before the courts that may well exceed both the language and intent of the statute. Indeed, it is anything but clear to us exactly which kinds of workplace behavior will be held to be actionable under this view and which will not.

18

Finally, the position taken by our good colleague in section II is in tension with this court's decision in <u>McWilliams v. Fairfax County Board of Supervisors</u>, 72 F.3d 1191, 1195 (4th Cir. 1996) (rejecting Title VII hostile-environment claims "where both the alleged harassers and the victim are heterosexuals of the same sex"). The court explained in <u>McWilliams</u> that same sex harassment all too often takes place not "`because of the [target's] sex'" but rather "`because of' the victim's known or believed prudery, or shyness, or other form of vulnerability to sexually-focused speech or conduct" or because of the perpetrator's own sexual "obsession," "insecurity," "vulgarity," or simple "meanness of spirit." <u>Id.</u> at 1196. While <u>McWilliams</u> technically did not reach the question addressed by Judge Niemeyer in section II, <u>id.</u> at 1195 n.4, it surely suggested that the many possible explanations for same gender incidents dictate caution in recognizing them as the basis for a Title VII action. If Title VII is to be extended to cover a whole new generation of same sex harassment claims, it is far better that it be accomplished by legislative action than by judicial fiat. The last place to reach out to recognize such claims is a case whose lack of merit is, in all events, apparent.

19