**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

DIANE P. MCNAIR,
Plaintiff-Appellant,

v.

No. 98-1110

COMPUTER DATA SYSTEMS,
INCORPORATED (CDSI),
Defendant-Appellee.

Appeal from the United States District Court
for the District of South Carolina, at Aiken.
Charles E. Simons, Jr., Senior District Judge.
(CA-94-3509-1-6BC)

Argued: December 2, 1998

Decided: January 26, 1999

Before HAMILTON, LUTTIG, and KING, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** John Paul Batson, Augusta, Georgia, for Appellant. Kathryn Thomas, GIGNILLIAT, SAVITZ & BETTIS, Columbia, South Carolina, for Appellee. **ON BRIEF:** William Sussman, Augusta, Georgia, for Appellant. Stephen T. Savitz, GIGNILLIAT, SAVITZ & BETTIS, Columbia, South Carolina, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Plaintiff-appellant Diane McNair appeals from an order of the United States District Court for the District of South Carolina grant-ing summary judgment to the defendant-appellee Computer Data Sys-tems, Inc., on her Title VII claims of racial and sexual discrimination and retaliation. For the reasons that follow, we affirm.

I.

In 1991, Computer Data Systems, Inc. (CDSI) hired Diane McNair, a black female, for the position of Senior Systems Engineer. CDSI had previously been contracted by the General Services Administra-tion (GSA) to provide automated data processing support to a number of federal government agencies, including the Department of Energy (DOE) at its Savannah River Site in Aiken, South Carolina. McNair was assigned to the DOE Help Desk Support task, a nine-member team charged with providing computer assistance to DOE end-users at the Savannah River Site. Pursuant to CDSI's contract with GSA, each employee was assigned a GSA contract title and skill level that together determined the rate at which CDSI billed GSA for the ser-vices of that employee. Because the GSA contract titles were based solely on the needs of the individual subscribing federal agency, they did not necessarily reflect the employees' actual titles with CDSI. That is to say, each employee's compensation and terms of employ-ment with the company were determined without respect to the GSA contract title to which he might at any one time be assigned.

During negotiations in late 1993 to extend CDSI's commitment to provide Help Desk support to DOE systems users, CDSI submitted a new staffing proposal, modified at the behest of DOE representative Joe Kleshick to reflect more accurately the support functions the com-pany was actually performing at the Savannah River Site. As a result

2

of the agreed-upon reorganization, one "senior software engineer" slot -- the contract title to which McNair had until that point been assigned -- was replaced with the lower contract title of "software system programmer/analyst," thus reducing the cost to GSA of the company's services. Explaining that her compensation, duties, and terms of employment with CDSI would not be affected by the change, McNair's supervisors reassigned her to the newly created "software system programmer/analyst" contract title.

Unhappy with the switch in her contract title and unsatisfied by the company's explanations, McNair wrote a letter to DOE Human Resources Contractor Relations department dated November 2, 1993, inquiring as to why her contract title had been changed. DOE officials notified representatives of both CDSI and GSA of McNair's letter, and began an investigation into her concerns about the manner in which her contract title had been changed. On November 5, 1993, three days after McNair's initial letter to DOE, George Peacock, a Group Manager at CDSI, met with McNair and instructed her that any future grievances should be brought in a proper forum, and that she was not to communicate further with DOE, CDSI's client, about this matter. In spite of these explicit instructions not to communicate with DOE, McNair spoke to a DOE investigator on November 15 and wrote a follow-up letter on November 17. On January 6, 1994, she met personally with the Director of DOE's Office of Economic Impact and Diversity.

In early February, McNair's direct supervisor, Alan Wingard, assigned her the project of organizing all DOE software for the purpose of identifying and destroying software that was obsolete. In anticipation of a planned move to a new site, Wingard gave McNair nine days to complete the task. McNair argued with Wingard about the feasibility of the project, fell behind, and ultimately suffered a severe asthma attack before the project was completed. As a result of that attack, appellant was absent from work for three weeks, during which time she refused to comply with the company's recently adopted call-in procedures for sick employees. When she returned to work on March 14, McNair was relieved from her Help Desk duties so that she could pack her office for the scheduled move, as her co-workers had done in her absence. Despite being given more than two full days to complete a packing job each of her co-workers had fin-

3

ished in one, McNair did not have her office ready when the movers arrived as scheduled on March 16, and in fact was not even present at the appointed time. Two days later, on March 18, Project Manager Chuck Gillespie issued McNair a written Reprimand/Warning for violating CDSI policy with respect to the call-in procedures, failing to complete the move to a new building in a timely fashion, being away from her work area without authorization for two hours on the day of the move, and failing to follow her supervisor's instructions.

In April, 1994, just over a month after she received this reprimand, McNair filed a Charge of Discrimination with the EEOC in which she alleged that she had been "discriminated against in that [her] job title was changed" and that she had been "harassed in that [she] ha[d] been given unrealistic job assignments with deadlines . . . and [had] been disciplined by [her supervisor]." She specifically alleged that the harassment and discipline were "in retaliation for filing a complaint with the DOE."

In December of that year, McNair filed a complaint against CDSI in United States District Court for the District of South Carolina on the basis of these allegations of discrimination and retaliation. In the course of discovery, defendant CDSI learned that McNair had falsified her educational credentials and job history on her resume and application. Citing its long-standing policy of firing employees who are discovered to have made material misrepresentations on their resumes and job applications, CDSI terminated McNair's employment with the company in May, 1995.

McNair then filed a second EEOC charge alleging that her termination was in retaliation for her complaint and thus constituted an additional violation of Title VII. She subsequently amended her complaint in this action alleging, inter alia, that her contract title was changed on the basis of her sex and race, and that CDSI retaliated against her through unrealistic job assignments, discipline, and, ultimately, discharge.

The district court adopted the recommendation of a magistrate judge in granting summary judgment in favor of the defendant on the claim that CDSI violated Title VII by changing McNair's contract title. The court also granted -- and this in spite of the magistrate's

4

recommendations to the contrary -- defendant's motion for summary judgment on plaintiff's claims of retaliation. McNair appeals from the district court's order granting summary judgment to the defendants on all counts.**1**

II.

Appellant contends first that the district court erred in granting summary judgment on her claim that CDSI discriminated against her on the basis of sex and race by changing her GSA contract title. We disagree.

Title VII prohibits discrimination on the basis of race or sex with respect to "compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a)(1). In order to establish a prima facie case of discrimination under this provision of Title VII, an employee must present evidence showing that she suffered "adverse employment action" because of her race or sex. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 507 (1993). Not every employment decision that displeases the employee constitutes an "adverse employment action" for the purposes of Title VII, however. Rather, as we have repeatedly recognized, "there are many interlocutory or mediate decisions having no immediate effect upon employment conditions which were not intended to fall within the direct proscriptions of [Title VII]." Page v. Bolger, 645 F.2d 227, 233 (4th Cir. 1981). Instead, the disparate treatment theory of sexual or racial discrimination-- the theory upon which this first claim is based -- "focuse[s] on the question whether there has been discrimination in what could be characterized as ultimate employment decisions such as hiring, granting leave, discharging, promoting and compensating." Id. at 233.

_____

**1** The district court also granted summary judgment to the defendant on plaintiff's claim of a hostile work environment based on race and gender. It is not clear from her submissions whether McNair continues to press her appeal from the district court's order insofar as it concerned her hostile environment claim. In any event, we affirm the award of summary judgment on plaintiff's hostile environment claim on the reasoning of the district court.

We agree with the district court that appellant failed to satisfy her burden of presenting a prima facie case of discrimination because the change in her GSA contract title was not attended by a commensurate reduction in privileges, responsibilities, compensation, or benefits. We are satisfied that the mere administrative change in contract title, far from rising to the level of an "ultimate employment decision," is properly characterized as one of the countless "interlocutory or mediate" employment decisions that simply are not, without more, actionable under Title VII. See, e.g.,Flaherty v. Gas Research Institute, 31 F.3d 451, 456 (7th Cir. 1994) (semantic change in title and change in supervisor not actionable under analogous provision of ADEA); Crady v. Liberty Nat'l Bank & Trust Co., 993 F.2d 132, 136 (7th Cir. 1993) (lateral transfer with semantic change in title and alteration of job responsibilities similarly not actionable under ADEA); Harlston v. McDonnell Douglas Corp., 37 F.3d 379, 382 (8th Cir. 1994) (reassignment to new position with no diminution in title, salary, or benefits insufficient to establish adverse employment action).**2**

III.

Appellant next argues that the district court erred in granting summary judgment in favor of the defendant on her claim that CDSI violated 42 U.S.C. § 2000e-3(a) by retaliating against her for filing a complaint with DOE -- the November 2, 1993 letter-- about the change in her contract title. Again, we disagree.

_____

**2** McNair contends that the change in her GSA contract title would ultimately lead to a discriminatory failure to promote, because only individuals with the higher GSA job title received promotions. However, McNair never alleged denial of promotion in either of her two EEOC charges, and she is therefore precluded from litigating such a claim. Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 962-64 (4th Cir. 1996); King v. Seaboard Coast Line, 538 F.2d 581, 583 (4th Cir. 1976). Even were we to consider appellant's claim that the change in contract title adversely affected her chances for promotion, we would still conclude that while actual failure to promote constitutes an actionable "ultimate employment decision," the particular employment action in question, as a decision of the "interlocutory or mediate" variety, does not.

Section 2000e-3(a) provides, in relevant part, that,

> [i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

In order to establish a prima facie case of retaliation under this section, plaintiff must show 1) that she engaged in protected activity under Title VII; 2) that the employer thereafter took adverse employment action against her; and 3) a sufficient causal connection existed between her protected activity and the employer's adverse action. Hopkins v. Baltimore Gas and Elec. Co., 77 F.3d 745, 754 (4th Cir. 1996).

Although the magistrate judge concluded that appellant had satisfied her burden of presenting evidence to support a prima facie showing of retaliation, the district court held that McNair had not demonstrated that she had suffered any legally cognizable "adverse employment action" prior to her termination. Citing Page v. Bolger and Mattern v. Eastman Kodak Co., 104 F.3d 702 (5th Cir. 1997), a recent Fifth Circuit opinion applying the Page "ultimate employment decision" standard in the context of a claim of unlawful retaliation, the district court, while not addressing the question whether McNair's complaint to DOE satisfied the "protected activity" prong, held that the written reprimand and the "unrealistic job assignments with deadlines" did "not amount to adverse employment actions" sufficient to support a Title VII claim of retaliation "because of their lack of consequence." J.A. at 528.

We agree with the district court that appellant failed to satisfy her burden of presenting evidence to support a prima facie case of discriminatory retaliation, but do so without proceeding to the contested question whether the Page v. Bolger standard for adverse employment actions in discrimination claims brought under section 2000e-2(a) is applicable in the context of a claim of prohibited retaliation brought under the differently-worded section 2000e-3(a). Compare

7

Mattern v. Eastman Kodak, 104 F.3d 702 (5th Cir. 1997), and Ledergerber v. Stangler, 122 F.3d 1142, 1144 (8th Cir. 1997) (holding in retaliation case that only adverse employment actions that "rise to the level of an ultimate employment decision[are] intended to be actionable under Title VII"), with Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1456 (11th Cir. 1998) ("Title VII's protection against retaliatory discrimination extends to adverse actions which fall short of ultimate employment decisions."). Rather, we base our affirmance on appellant's failure even to show that the activity she had engaged in was protected from retaliation under the terms of Title VII.

This court has recognized, consistent with the express language of section 2000e-3(a), that an employer may not retaliate against an individual either for "opposing discriminatory practices in the workplace" or for "participating in an ongoing investigation or proceeding under Title VII." Laughlin v. Metropolitan Washington Airports Auth., 149 F.3d 253, 259 (4th Cir. 1998). Once appellant filed her first charge with the EEOC, the protections of the "participation clause" were unquestionably triggered. Because appellant alleges that CDSI retaliated against her for actions taken before she filed her first EEOC charge, however, we need only consider this claim under the terms of the section's "opposition clause."

In prior cases, we have held that the section's"opposition clause," with its seemingly open-ended reference to any activity that can properly be characterized as "opposing" unlawful workplace discrimination, covers a broader range of employee conduct than does the more tightly circumscribed "participation clause." See id. at 259 ("To qualify as opposition activity an employee need not engage in the formal process of adjudicating a discrimination claim."); Armstrong v. Index Journal Co., 647 F.2d 441, 448 (4th Cir. 1981). Nonetheless, the "opposition clause," by its very terms, requires that the employee at least have actually opposed employment practices made unlawful by Title VII. That is to say, the clause protects opposition neither to all unlawful employment practices nor to practices the employee simply thinks are somehow unfair.

Under the by-now familiar McDonnell Douglas burden-shifting scheme, McDonnell Douglas v. Green, 411 U.S. 792, 801-06 (1973), in order to defeat appellee's motion for summary judgment appellant

8

had the burden of forecasting evidence that her letter of November 2, 1993, did in fact constitute just such protected opposition activity. In recommending denial of defendant's motion for summary judgment, the magistrate concluded that McNair had met this evidentiary burden. Although the district court did not expressly consider the magistrate's recommendation on this question, we have and we do not accept it.

We conclude instead that appellant failed to satisfy this burden because she presented no evidence that the November 2, 1993, letter to DOE officials contained even implicit or indirect opposition to racial or sexual discrimination by anyone -- let alone anyone at CDSI. Most significantly, in opposing CDSI's motion for summary judgment, appellant never produced a copy of the letter -- the asserted "protected activity" -- in question. Rather, the court had before it, as we do today, only appellant's <u>characterization</u> of the letter's contents and purpose. In her amended complaint and sworn deposition testimony, appellant averred simply that in her November 2, 1993, letter she "express[ed] her concern" about DOE initiating a change in her GSA contract title and inquired "why [her] Contract title changed." Thus, the record at best supports a vague inference that the letter manifested McNair's "concern" that she had generally been treated unfairly, by either the client, DOE, or her employer, CDSI. However, "a general complaint of unfair treatment does not translate into a charge of illegal . . . discrimination." <u>Barber</u> v. <u>CSX Distribution Servs.</u>, 68 F.3d 694, 702 (3rd Cir. 1995) (holding that protected activity for purposes of identical anti-retaliation provision of ADEA requires specific allegation of unlawful age discrimination). On the record before the district court, then, there is no question that the November 2, 1993, letter could not satisfy the "protected activity" element of a <u>prima facie</u> case of retaliation.

While the evidence in the record is insufficient to establish that the November 2, 1993, letter addressed concerns about racial or sexual discrimination, thereby implicating the protections of the opposition clause, appellee's own submissions confirm that subsequent communications between DOE officials and McNair <u>did</u> involve such allegations. Thus, appellant does not limit her claim of protected activity, as did the magistrate's report, to the November 2, 1993, letter alone. Rather, she contends, more broadly, that she engaged in protected

9

activity by "asserting rights," presumably in the context of her later discussions and communications with DOE. We cannot conclude, however, that these later communications, expressly forbidden in advance by McNair's supervisors at CDSI, constituted protected activity either.

Although we have recognized that "[o]pposition activity encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities," Laughlin, 149 F.3d at 259, we have never concluded that repeated complaints to the employer's client, in direct contravention of explicit instructions to cease such communications, are protected. Quite to the contrary, we have recognized that protection of "opposition" activity is not absolute, Laughlin, 149 F.3d at 259 n.4 ("[T]he scope of protection for activity falling under the participation clause is broader than for activity falling under the opposition clause."), and that consideration must be given to the legitimate operational concerns of the employer. Thus, in determining whether opposition activity warrants protection from discipline, we "`balance the purpose of the Act to protect persons engaging reasonably in activities opposing . . . discrimination, against Congress' equally manifest desire not to tie the hands of employers in the objective selection and control of personnel." Armstrong v. Index Journal Co., 647 F.2d at 448 (4th Cir. 1981) (quoting Hochstadt v. Worcester Found. for Experimental Biology, 545 F.2d 222, 231 (1st Cir. 1976)).

Both parties concede that as a result of McNair's continued complaints, DOE threatened to withdraw its participation in GSA's contract with CDSI. We do not believe that Title VII, which established comprehensive formal procedures for pursuing claims of racial and sexual discrimination, nonetheless renders the employer defenseless against any "informal" employee actions that threaten seriously to disrupt, if not sever, its essential business relationships. At least where, as here, an employer has informed its employee of the availability of proper grievance procedures and instructed her to cease further communications with the client, and the employee disobeys these explicit instructions by continuing to pursue a course of conduct that threatens the employer's business relationship with that client, we believe the balance must be struck in favor of the employer. See Armstrong, 647

10

F.2d 441, 448 ("Section 704(a) . . . was not intended to immunize insubordinate, disruptive, or nonproductive behavior at work."). Accordingly, we cannot conclude that McNair's continued activities in communicating her concerns to DOE representatives <u>after</u> she was explicitly instructed not to do so were protected from even the modest disciplinary action appellant alleges in this case.

IV.

Finally, we reject appellant's contention that the district court erred in rejecting the magistrate's recommendation and granting summary judgment in favor of the defendant on her claim that CDSI terminated her employment in retaliation for the filing of her first EEOC charge. Even assuming McNair had demonstrated a <u>prima facie</u> case that the discharge was in retaliation for her participation in a formal EEOC investigation, we conclude that the district court was correct in holding that she did not present evidence that CDSI's articulated, legitimate non-retaliatory reason for her discharge was mere pretext.

We agree with the district court that appellant offered no satisfactory rebuttal of defendant's evidence that she had misrepresented and omitted material information concerning her educational credentials and relevant job history from her resume and employment application. McNair offered evidentiary responses that can most charitably be described as incomplete, and in so doing utterly failed to meet her burden of eliminating concerns that she was terminated because of these material discrepancies. <u>Hughes</u> v. <u>Bedsole</u>, 48 F.3d 1376, 1383-84 (4th Cir. 1995). Furthermore, McNair offered no evidence to contest her own signed Employment Application, introduced into the record by CDSI, stating that:

> I understand that if in the judgment of the company there has been material misrepresentation or omission of the facts called for herein, that it will result in immediate dismissal.

Lastly, CDSI's evidence went unrebutted that the company regularly enforced this established policy of terminating employees subsequently found to have lied on their resumes and applications, and had in fact discharged at least twelve individuals on these grounds within the preceding six years.

11

In light of appellant's failure to produce evidence to prove with "a new level of specificity" that appellee's legitimate nonretaliatory reasons for her termination were pretextual, Jiminez v. Mary Washington College, 57 F.3d 369, 377 (4th Cir. 1995), the district court properly held that her claim of retaliatory discharge could not survive appellee's motion for summary judgment.**3**

V.

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED

_____

**3** Appellant argues that these material misrepresentations constitute "after-acquired evidence" which the defendant has the burden of proving as an affirmative defense. This argument is utterly without merit, as the reasons proffered for McNair's termination are not "after-acquired evidence" as that term is understood and applied by the Supreme Court. McNair's misrepresentations were in fact CDSI's stated reason for her termination, not some post-hoc justification advanced for the first time in the context of litigation. Cf. McKennon v. Nashville Banner Publ'g. Co., 513 U.S. 352 (1995).

12